PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
————

Nos. 10-2239 and 10-2240
————

In re:  AMERICAN CAPITAL EQUIPMENT, LLC AND
SKINNER ENGINE COMPANIES, INC.,

Debtors – Appellants, No. 10-2239
————

In re:  AMERICAN CAPITAL EQUIPMENT, LLC AND
SKINNER ENGINE COMPANIES, INC.,

Debtors

WILLARD E. BARTEL,

Appellant, No. 10-2240
————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Nos. 2-09-cv-00886 and 2-09-cv-00887)
District Judge:  Honorable Gary L. Lancaster
————

Argued October 25, 2011
Before:  FISHER, VANASKIE and ROTH, *Circuit Judges*.

(Filed: July 25, 2012)

Robert M. Horkovich (Argued)
Anderson, Kill & Olick
1251 Avenue of the Americas, 42-154W
New York, NY  10020

Sally E. Edison
McGuireWoods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA  15222
        *Counsel for American Capital
        Equipment, LLC, and Skinner
        Engine Companies, Inc.*

Robert A. Arcovio
Kyle T. McGee
Margolis Edelstein
525 William Penn Place, Suite 3300
Pittsburgh, PA  15219

Michael A. Kotula
Lawrence A. Levy
Rivkin Radler
926 Rexcorp Plaza
Uniondale, NY  11556-0111
        *Counsel for Allianz Global Risks*

John W. Burns

Dickie, McCamey & Chilcote
Two PPG Place, Suite 400
Pittsburgh, PA  15222

Leslie A. Davis
Leslie A. Epley
Mark D. Plevin
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2505
     *Counsel for Century Indemnity Co.*
     *and Pacific Employers Ins. Co.*

David C. Christian
Jason J. DeJonker
Seyfarth Shaw
131 South Dearborn Street, Suite 2400
Chicago, IL  60603

Cushing O. Condon
Andrew I. Mandelbaum
Ford, Marrin, Esposito, Witmeyer & Gleser
88 Pine Street
23rd Floor, Wall Street Plaza
New York, NY  10005

David K. Rudov
Rudov & Stein
100 First Avenue
First & Market Building, Suite 500
Pittsburgh, PA  15222

*Counsel for Continental Casualty Co.*
*and Continental Insurance Co.*

Erik Sobkiewicz
Campbell & Levine
330 Grant Street
1700 Grant Building
Pittsburgh, PA  15219

Zakarij O. Thomas
Buchanan Ingersoll & Rooney
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA  15219
          *Counsel for Fairchild Corp.*

Peter B. Ackerman
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2505

Jeff D. Kahane
Russell W. Roten
Duane Morris
865 South Figueroa Street, Suite 3100
Los Angeles, CA  90017

Jeffrey W. Spear
Joel M. Walker
Duane Morris
600 Grant Street, Suite 5010

Pittsburgh, PA  15219
    *Counsel for Great American Ins. Co.*

Steven Bennett
Craig Goldblatt
Caroline Rogus
Danielle M. Spinelli (Argued)
Wilmer Cutler Pickering Hale & Dorr
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006

Timothy K. Lewis
Eric T. Smith
Paul H. Titus
Robert J. Williams
Schnader Harrison Segal & Lewis
120 Fifth Avenue
2700 Fifth Avenue Place
Pittsburgh, PA  15222

James P. Ruggeri
Shipman & Goodwin
1133 Connecticut Avenue, N.W.
3rd Floor, Suite A
Washington, DC  20036

Sambhav N. Sankar
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station

Washington, DC  20026
*Counsel for Hartford Accident &*
*Indemnity Co. and First State Ins. Co.*

Greg Bernhard
Michael S. Davis
Yoav M. Griver
Zeichner, Ellman & Krause
575 Lexington Avenue
New York, NY  10022

Beverly W. Manne
Tucker Arensberg
1500 One PPG Place
Pittsburgh, PA  15222

Michael A. Shiner
Tucker Arensberg
1500 One PPG Place
Pittsburgh, PA  15222
*Counsel for National Union*
*Fire Ins. Co. of Pittsburgh, PA*

Kimberly A. Coleman
John M. Steiner
Leech, Tishman, Fuscaldo & Lampl
525 William Penn Place
30th Floor, Citizens Bank Building
Pittsburgh, PA  15219
*Counsel for the Official Committee*
*of Unsecured Creditors*

Elisa Alcabes
Andrew S. Amer (Argued)
Katherine A. McLendon
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY  10017

Joseph G. Gibbons
Amy E. Vulpio
White & Williams
Two Logan Square
12th Floor, 18th & Arch Streets
Philadelphia, PA  19103

Leonard P. Goldberger
WolfBlock
1650 Arch Street, 22nd Floor
Philadelphia, PA  19103

Mark A. Martini
Dennis J. Mulvihill
Robb, Leonard & Mulvihill
500 Grant Street
BNY Mellon Center, 23rd Floor
Pittsburgh, PA  15219
        *Counsel for Travelers Casualty
        & Surety Co*.

Robert A. Arcovio
Kyle T. McGee

Margolis Edelstein
525 William Penn Place, Suite 3300
Pittsburgh, PA  15219

Leslie A. Epley
Mark D. Plevin
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2505

Michael A. Kotula
Lawrence A. Levy
Rivkin Radler
926 Rexcorp Plaza
Uniondale, NY  11556-0111
       *Counsel for Firemans Fund Ins.*
       *Co. of Ohio*

Alan S. Miller
Picadio, Sneath, Miller & Norton
600 Grant Street
4710 U.S. Steel Tower
Pittsburgh, PA  15219

Robert B. Millner
SNR Denton US
233 South Wacker Drive
8000 Sears Tower
Chicago, IL  60606
       *Counsel for Liberty Mutual Ins. Co.*

Douglas A. Campbell
Erik Sobkiewicz
Campbell & Levine
330 Grant Street
1700 Grant Building
Pittsburgh, PA  15219

Alan Kellman (Argued)
The Jaques Admiralty Law Firm
645 Griswold, Suite 1370
Detroit, MI  48226
  *Counsel for Willard E. Bartel*

Craig Goldblatt
Danielle M. Spinelli (Argued)
Wilmer Cutler Pickering Hale & Dorr
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006

Robert J. Williams
Schnader Harrison Segal & Lewis
120 Fifth Avenue
2700 Fifth Avenue Place
Pittsburgh, PA  15222
  *Counsel for Hartford Fire Ins. Co.*

Robert S. Bernstein
Bernstein Law Firm
707 Grant Street
Suite 2200, Gulf Tower
Pittsburgh, PA  15219

*Counsel for Legal Representative for*
*Future Asbestos Claimants*

Erik Sobkiewicz
Campbell & Levine
330 Grant Street
1700 Grant Building
Pittsburgh, PA  15219
> *Counsel for Maritime Asbestosis*
> *Legal Clinic*

Joseph M. Fornari, Jr.
United States Department of Justice
Office of the Trustee
1001 Liberty Avenue
970 Liberty Center
Pittsburgh, PA  15222
> *Counsel for U.S. Trustee*

Jeffrey J. Sikirica
121 Northbrook Drive
Gibsonia, PA 15044
> *Counsel for Interim Chapter 7*
> *Trustee and Jeffrey J. Sikirica*

Laura A. Foggan
Wiley Rein
1776 K Street, N.W.
Washington, DC  20006
> *Counsel for Complex Insurance*
> *Claims Litigation Association*

10

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

American Capital Equipment, Inc. and Skinner Engine Company (collectively, "Skinner"), the debtors in this case, appeal from the District Court's order affirming the Bankruptcy Court's order, which converted Skinner's Chapter 11 bankruptcy case to a Chapter 7 on the basis that its plan is patently unconfirmable. Joining its appeal is Willard Bartel ("Bartel"), representative for the estate of an asbestos claimant. Appellees are insurers (Travelers Casualty and Surety Company, Allianz Global Risks, Century Indemnity Co., Pacific Employers Insurance Co., Continental Casualty Co., Cont. Ins. Co., Fairchild Corp., Great American Ins. Co., Hartford Accident & Indemnity Co., First State Ins. Co., Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., Official Committee of Unsecured Creditors, Firemans Fund Ins. Co. of OH, Liberty Mut'l Ins. Co., Hartford Fire Ins. Co.) (collectively, "Insurers"), the legal representative for future asbestos claimants, the Maritime Asbestosis Legal Clinic, and the Interim Chapter 7 Trustee, Jeffrey J. Sikirica.

The issue before us is whether a bankruptcy court can determine at the disclosure statement stage that a Chapter 11 plan is unconfirmable without first holding a confirmation hearing. We hold that a bankruptcy court has the authority to do so if it is obvious that the plan is patently unconfirmable, such that no dispute of material fact remains and defects

11

cannot be cured by creditor voting.  Additionally, we find that the plan in this case was patently unconfirmable, and that the Bankruptcy Court did not err in converting the case to Chapter 7.  Accordingly, we will affirm.

## I.

Skinner was founded in 1868 as a manufacturer of steam engines for merchant ships.  From the 1930s through the 1970s, Skinner manufactured ship engines and parts allegedly containing asbestos.  In 1998, American Capital Equipment, LLC acquired all of Skinner's common stock, and secured a lien on Skinner's assets from PNC Bank to finance the purchase.  Based on Skinner's lack of cash flow to maintain operations or service its secured debt, Skinner and American Capital each filed petitions for bankruptcy relief under Chapter 11 in 2001.

### *The Asbestos Claims*

At the time that Skinner and American Capital filed for bankruptcy, over 29,000 asbestos claims were pending against Skinner.  Merchant mariners began bringing personal injury claims against Skinner in the 1980s.  The claims fell within federal admiralty jurisdiction, so they were assigned to a special maritime docket entitled "MARDOC."  In 1991, the MARDOC cases were consolidated with cases from 87 other judicial districts by the Judicial Panel on Multidistrict Litigation in the Eastern District of Pennsylvania (the "MDL Court").  *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 416-17 (J.P.M.L. 1991).  In May 1996, the MDL Court administratively dismissed the remaining MARDOC

12

claims without prejudice, noting that the claimants had "provide[d] no real medical or exposure history," and had been unable to do so for months. *In re Asbestos Prods. Liab. Litig. (No. VI)*, No. 2 MDL 875, 1996 WL 239863, at *1-2 (E.D. Pa. May 2, 1996). It also ordered that these "asymptomatic cases" could be activated if the respective plaintiffs began to suffer from an impairment and could show (1) "satisfactory evidence [of] an asbestos-related personal injury compensable under the law"; and (2) "probative evidence of exposure" to defendant's products. *Id.* at *5. In 2002, the MDL Court ordered that administratively dismissed cases remain active for certain purposes (e.g., entertaining settlement motions and orders, motions for amendment to the pleadings, etc.), and in 2003, clarified that the administrative dismissals were "not intended to provide a basis for excluding the MARDOC claimants from participating in settlement programs or prepackaged bankruptcy programs[.]" *In re Am. Capital Equip.*, 296 F. App'x 270, 272 (3d Cir. 2008) (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, Order Granting Relief to MARDOC Claimants with Regard to *Combustion Eng'g, Inc.*, No. 2 MDL 875 (E.D. Pa. Feb.19, 2003)).

Since the administrative dismissals, only a few dozen of the thousands of MARDOC asbestos claims against Skinner have met the criteria for reinstatement. Appellants do not dispute that none of those claims have resulted in a judgment or settlement against Skinner. *See In re Am. Capital Equip., Inc.*, 405 B.R. 415, 421-22 (Bankr. W.D. Pa. 2009).

13

### Skinner's Insurance

Skinner claims entitlement to insurance coverage under primary comprehensive general liability insurance policies, as well as various excess policies, provided by Insurers. The policies contain standard clauses obligating the insured to cooperate in the defense of claims against it and prohibiting it from settling claims without the Insurers' consent. For example, Travelers' Insurance primary policies state:

> "[Travelers] shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . ."

Travelers' excess policies contain a similar statement.[1] An additional clause in all Travelers' policies states that:

> "The Insured shall cooperate with [Travelers] and, upon [Travelers'] request, assist in making settlements, in the conduct of suits . . . and the insured shall attend hearings and trials and

---

[1] "[Travelers] shall defend any suit . . . [and] may make such investigation of settlement of any claim or suit as it deems expedient."

14

assist in securing and giving evidence and obtaining the attendance of witnesses."

Prior to the bankruptcy petition filing, Skinner's primary insurers defended the asbestos claims against Skinner. The parties entered into a defense cost-sharing agreement under which the primary insurers and Skinner each agreed to pay a portion of the costs.

### The Chapter 11 Bankruptcy Plans

Skinner has proposed five bankruptcy plans since filing for bankruptcy. Only the Fifth Plan is at issue here, although its relationship to several other plans – particularly the Third Plan – has some relevance.

Appellants filed the Disclosure Statement and Joint Plan of Reorganization for their First Plan on June 6, 2001. The plan proposed a sale of Skinner's assets to the president of American Capital's parent corporation. The plan provided that asbestos claimants would be paid from any insurance proceeds available at the time of a final judgment. Numerous objections from creditors (though not from asbestos claimants) led Skinner to amend the plan.

Appellants filed the Second Plan on September 12, 2001. The plan proposed a sale of Skinner's assets to the highest bidder. It also included future asbestos claimants in the asbestos claimants' class ("Asbestos Claimants") by providing for a trust funded through insurance proceeds. The Bankruptcy Court approved the disclosure statement and scheduled a confirmation hearing for October 25, 2001.

15

However, before the confirmation hearing could occur, the voting creditors rejected the Second Plan.

On October 29, 2002, the Bankruptcy Court approved a sale of Skinner's assets, and it sold all of its assets for $1,165,000, which went to PNC Bank in satisfaction of its secured lien. PNC Bank agreed to set aside $35,000 towards the costs of processing asbestos claims. Travelers agreed to not oppose the sale, provided that Skinner would not immediately seek conversion or dismissal, but give creditors and interested parties 180 days "to negotiate a consensual plan of reorganization[.]" Neither Travelers nor creditors or other interested parties ever proposed such a plan. In March 2003, after the sale of Skinner's assets, the Committee of Unsecured Creditors moved to convert the case to Chapter 7. The motion was then continued several times so the parties could attempt to negotiate a workable plan with Skinner.

On February 24, 2004, Appellants filed the Third Plan, proposing creation of a § 524(g) asbestos trust pursuant to the Bankruptcy Code. The trust would be funded by the insurance recoveries, the $35,000 from PNC Bank, and the common stock of "Reorganized Skinner," and would provide for all present and future Asbestos Claimants. The plan proposed to adopt a claims submission standard (known as the Johns-Manville Personal Injury Standard), which required each Asbestos Claimant to meet two criteria: (1) show a medically diagnosed asbestos-related injury, and (2) show exposure to Skinner's asbestos-containing products. The plan also provided for a surcharge, which would give Skinner the right to ten percent of cash from insurance actions and policies to pay creditors through a Plan Payment Fund.

16

On February 2, 2005, the Bankruptcy Court approved the disclosure statement and set a confirmation hearing for March 10, 2005. Skinner's creditors voted to accept the Third Plan.

On February 22, 2005, Travelers commenced a breach of contract action against Skinner ("Insurance Coverage Action"), claiming that the Third Plan breached its right to settle and defend claims and seeking a declaratory judgment that the alleged breach relieved Travelers of its coverage obligations under the policies. Skinner then counterclaimed and filed a third-party complaint naming the other Insurers, and seeking a declaratory judgment in its favor. On May 2, 2005, the Bankruptcy Court filed orders denying Insurers' motions to withdraw reference of the adversary proceeding and other objections they had previously raised. *In re Am. Capital Equip.,* 325 B.R. 372 (Bankr. W.D. Pa. 2005); *In re Am. Capital Equip.,* 324 B.R. 570 (Bankr. W.D. Pa. 2005). The declaratory judgment action never advanced beyond the pleadings stage, but rather, was dismissed without prejudice after the Bankruptcy Court converted the case to Chapter 7. Order of June 3, 2009, *In re Am. Capital Equip.*, Adv. No. 05-2253 (Bankr. W.D. Pa. June 3, 2009).

In June 2005, Insurers filed a Motion to Dismiss ("*American Capital I*"), arguing pursuant to 11 U.S.C. § 1112(b) that the plan was no longer proceeding in good faith, and no longer served a legitimate Chapter 11 purpose. At the hearing on August 15, 2005, the Bankruptcy Court noted that Skinner did not have a going concern, and stated that without a going concern, it could not approve a trust

17

pursuant to § 524(g).[2]  Skinner moved to stay further proceedings in order to modify the plan, and the Bankruptcy Court granted the motion.

After conducting hearings, the Bankruptcy Court denied Insurer's motion to dismiss, and the District Court affirmed, finding that the case served a legitimate bankruptcy purpose in that it maximized value to creditors, and that Skinner was not seeking a litigation advantage through the bankruptcy process.  *In re Am. Capital Equip.*, LLC, No. 06-0891 (W.D. Pa. May 11, 2007).  We affirmed, and remanded the case to the Bankruptcy Court for further proceedings.  *See In re Am. Capital Equip.*, 296 F. App'x at 270.

During the pendency of the motion to dismiss proceedings, Skinner filed its Fourth Plan.  The plan again provided for a surcharge, which would give Skinner the right to twenty percent of cash from insurance actions and policies to pay creditors through the Plan Payment Fund.  However, this time the plan did not use a § 524(g) trust, but rather provided that a trustee would use criteria similar to those in the Third Plan to allow or disallow asbestos claims.  Asbestos Claimants who did not want to use the system could use the tort system, but any judgment would be subject to a temporary injunction until all bankruptcy-allowed claims had been paid.  In order to cover the plan's administrative costs until the surcharge provided sufficient revenue, the plan would be partly funded by a loan from a law firm

---

[2] The Bankruptcy Court's determination in this regard is not now before us.

18

representing the Asbestos Claimants. The Bankruptcy Court rejected the injunction and questioned the surcharge, giving Skinner further time to amend its plan.

Skinner filed a Fifth Plan, removing the temporary injunction against judgments for Asbestos Claimants who chose to pursue traditional tort remedies. It still included a twenty percent surcharge for Asbestos Claimants who decided to opt in to the plan's settlement process. The Surcharge would be used to pay creditors through the Plan Payment Fund, and fund the claims resolution process called the "Court Approved Distribution Procedures" ("CADP"). Specifically, the CADP provides that:

> "[e]ach Asbestos Claimant shall maintain full and complete ownership of his or her Asbestos Claim, including, without limitation, the right to prosecute or settle any Asbestos Claim, but upon the Asbestos Claimant submitting his or her claim to the CADP, he or she shall thereby have agreed to pay the Surcharge Cash from any amounts paid on account of the Asbestos Claim under and through the CADP."

Skinner acknowledged at least twice that the Plan would not work without the Surcharge.[3]

---

[3] At a hearing on January 10, 2006, the Bankruptcy Court inquired, "[C]an you do this without doing the 20 percent?" Skinner's counsel replied, "No." Again, on May 7, 2009, the Bankruptcy Court asked:

The CADP "provide[s] a basis for the Plan Trustee to evaluate Asbestos Claims[,]" and would implement claims allowance criteria similar to those in the Third and Fourth Plans. If Insurers disagree with the Trustee's determination, the CADP would permit them to elect a Court Determination by the Bankruptcy Court. Court Determinations would require the Bankruptcy Court to decide "solely on the basis of the documentation in the Asbestos Claim file when the Asbestos Claim was categorized, whether the Asbestos Claim

---

THE COURT: . . . is there any way you propose this plan without the 20 percent surcharge?

[Skinner's counsel]: Your Honor, the 20 percent surcharge is to be used to pay all the other creditors and non-asbestos creditors in the case. So without the 20 percent surcharge or some surcharge, unsecured creditors will receive nothing.

THE COURT: So the answer is no, you wouldn't do it without the 20 percent.

[Skinner's counsel]: Do it with a ten percent surcharge. We could do it with five.

THE COURT: No, you're going to need a surcharge of some kind.

[Skinner's counsel]: We need a surcharge of some kind so that we have a distribution to the rest of the creditors in the case.

20

should be categorized as a Scheduled Disease." In making this determination, the Bankruptcy Court would employ "baseball arbitration procedures," meaning that it "may select either the amount proposed by the Plan Trustee or the counteroffer of the Asbestos Insurance Company. The Bankruptcy Court may not select another amount as part of the Court Determination." The Bankruptcy Court's decision would be binding on the Insurers and not appealable. The CADP does not state whether Asbestos Claimants would be permitted to appeal a decision that favors Insurers.

### *The Present Appeal*

The Bankruptcy Court held hearings on the Fifth Plan's disclosure statement. In May 2009, it issued an opinion finding that the plan was facially unconfirmable, because it was not proposed in good faith and was forbidden by law in contravention of 11 U.S.C. § 1129(a)(3), and was not feasible pursuant to 11 U.S.C. § 1129(a)(11). *In re Am. Capital Equip., Inc.*, 405 B.R. 415, 423-24 (Bankr. W.D. Pa. 2009). Finding that Skinner would be unable to propose a confirmable plan, the Bankruptcy Court converted the case to a Chapter 7 pursuant to 11 U.S.C. § 1112(b). *Id*. at 426-27.

Skinner and Bartel appealed the Bankruptcy Court order to the District Court, which consolidated the appeals and affirmed the Bankruptcy Court's order in *Skinner Engine Co. v. Allianz Global Risk U.S. Ins. Co.,* No. 09-0886, 2010 WL 1337222 (W.D. Pa. March 29, 2010). Skinner and Bartel each appealed the District Court decision, and on May 12, 2010, we consolidated both appeals.

21

## II.

The District Court had jurisdiction over this bankruptcy case under 28 U.S.C. §1334(a), and referred the cases to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a). Pursuant to 28 U.S.C. § 158(a), the District Court had jurisdiction over the Bankruptcy Court's order converting the case to Chapter 7. We have jurisdiction to hear the appeal from the District Court under 28 U.S.C. §§ 158(d)(2004)[4] and 1291. *See In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 635 (3d Cir. 1998). On appeal, "we 'stand in the shoes' of the District Court and review the Bankruptcy Court's decision. . . . review[ing] the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error." *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc) (internal citations omitted).

---

[4] Pursuant to a 2005 amendment, the statute now lists 28 U.S.C. § 158(d) as 28 U.S.C. § 158(d)(1). However, this case was filed in 2001, prior to the effective date of the 2005 amendment, so as relevant, references to the Bankruptcy Code throughout this opinion refer to the previous version of the Code. *See In re Am. Capital Equip., LLC*, 296 F. App'x 270, 276 n.5 (3d Cir. 2008) (discussing the applicability of the pre-2005 statute in the present set of cases pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, § 1501, 119 Stat. 23 (2005)); *see also In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008) (Bankruptcy Code's 2005 amendment not applicable to Chapter 11 case filed prior to amendment's effective date).

III.

Appellants raise three primary issues on appeal. First, they challenge the Bankruptcy Court's procedure, claiming that the Bankruptcy Court erred in finding the Fifth Plan to be unconfirmable without first holding a confirmation hearing. Second, they argue that the Bankruptcy Court substantively erred in finding that the Fifth Plan was patently, or facially, unconfirmable. Finally, they argue that the Bankruptcy Court abused its discretion in converting its case from Chapter 11 to Chapter 7. We will discuss each of these issues in turn.

A.

Appellants argue that the Bankruptcy Court erred in deeming its plan to be unconfirmable without first holding a confirmation hearing. We disagree.

Federal Rule of Bankruptcy Procedure 3020(b)(2) states that "[t]he court shall rule on confirmation of the plan after notice and hearing[.]" Based on the plain language of this Rule, our Sister Circuits have held that a bankruptcy court "must hold an evidentiary hearing in ruling on confirmation." *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir. 1986); *accord In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988). The purpose of the hearing is for the bankruptcy court to "consider[] . . . objections raised by creditors, . . . [and] to determine whether the plan has met all of the requirements necessary for confirmation." *In re Williams*, 850 F.2d at 253.

Although the "hearing on the disclosure statement may be combined with the hearing on confirmation of a plan[,]" 11

U.S.C. § 1125(f)(3)(2004),[5] the Bankruptcy Court did not formally schedule the hearing as a confirmation hearing, but as a hearing to consider disclosure statement issues. We must thus consider whether the Bankruptcy Court erred in making a confirmability determination based on the hearing.

"Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage." *In re Larsen*, No. 09-02630, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011). Courts have recognized that "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." *Id*. (citations omitted); *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed."); *accord In re Miller*, No. 96-81663, 2008 WL 191256, at *3 (Bankr. W.D. La. Jan. 22, 2008); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D.

---

[5] This text was moved to 11 U.S.C. § 1125(f)(3)(C) following the 2005 amendments to the Bankruptcy Code. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Tit. IV, § 431, Pub. L. No. 109-8, 119 Stat. 23 (2005).

24

Cal. 2000); *In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989); *In re Unichem Corp.*, 72 B.R. 95, 100 (Bankr. N.D. Ill. 1987); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

The rationale is that the court's equitable powers under 11 U.S.C. § 105 "surely enable it to control its own docket" and thus, a "[c]ourt [should] not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements]." *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832-33 (Bankr. S.D. 1984); *see also In re Dakota Rail, Inc.*, 104 B.R. at 143 ("Only where the disclosure statement *on its face* relates to a plan that cannot be confirmed does the court have an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of the plan; otherwise, confirmation issues are left for later consideration."). Commentators agree that "[i]t appears to be within the discretion of the bankruptcy court to withhold approval of a disclosure statement if the accompanying plan is unconfirmable[.]" *The Disclosure Statement Hearing*, 6 Norton Bankr. L. Prac. § 110:15 (3d ed. 2012); *accord* Barbara J. Houser, et al, *Disclosure Statements: Confirmation and Cramdown of Chapter 11 Plans*, ST005 A.L.I.-A.B.A. 2177 (2011) ("[N]umerous courts have heard objections to the disclosure statement based upon contentions that the accompanying plan of reorganization is nonconfirmable -- in

25

other words, if a plan is not confirmable on its face as a matter of law, then the court will withhold approval of the disclosure statement."); 9C Am. Jur. 2d Bankr. § 2900 ("The bankruptcy court may consider objections and refuse to approve a disclosure statement when it is apparent that the accompanying plan is not confirmable.").

We find the reasoning of these many courts to be persuasive, and hold that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.[6]  A plan is patently unconfirmable where (1) confirmation "defects [cannot] be overcome by creditor voting results" and (2) those defects

---

[6] We caution, however, that bankruptcy courts must "[e]nsure that due process concerns are protected" by, *inter alia*, providing sufficient notice to plan proponents, and taking care to not prematurely convert a disclosure statement hearing into a confirmation hearing. *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 & n.10 (Bankr. E.D. Pa. 1987); *see also In re Larsen*, No. 09-02630, 2011 WL 1671538, at *2 (Bankr. D. Idaho May 3, 2011); *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).  This case raises no such due process concerns; the Bankruptcy Court's hearings on the issues were lengthy and thorough, and its April 9, 2009 order, which was served on plan proponents Skinner and Bartel, gave sufficient notice that confirmability issues would likely be considered at the May 7, 2009 disclosure statement hearing.

"concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Monroe Well Serv.,* 80 B.R. at 333. If no dispute of material fact remains and if defects cannot be cured by creditor voting or otherwise, then there is "nothing in either the language or logic of the Code requiring the court or parties to 'grind the same corn a second time,' and we will not read into the Code the requirement of redundancy." *In re Acequia, Inc.*, 787 F.2d at 1358-1359 (citation omitted) (noting that although confirmation requires an evidentiary hearing, courts need not ignore evidence already submitted). As we will discuss below, there was no error in the Bankruptcy Court's determination that the Fifth Plan was not confirmable, and that the confirmation defects cannot be cured and involve no material facts in dispute.

B.

Appellants argue that even if a Bankruptcy Court is permitted to make a confirmability determination at the disclosure statement stage, it erred in doing so here, because the plan is confirmable. We disagree.

A court shall confirm a plan only if, *inter alia*, it "has been proposed in good faith and not by any means forbidden by law[,]" and if it is feasible. 11 U.S.C. §§ 1129(a)(3), (11); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 n.59 (3d Cir. 2004) (interpreting 11 U.S.C. § 1129(a)(11)). The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute. *Accord In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa.

27

1996); *In re R & G Props., Inc.*, No. 08-10876, 2009 WL 2043873, at *5 (Bankr. D. Vt. July 6, 2009).

The Bankruptcy and District Courts found that the Fifth Plan did not meet the § 1129 requirements for confirmation. *In re Am. Capital Equip., Inc.*, 405 B.R. at 423-24; *Skinner Engine Co.,* No. 09-0886, 2010 WL 1337222, at *2. We agree that the Fifth Plan is not confirmable on two separate and independently sufficient bases under § 1129(a): (1) it is not feasible, and (2) it has not been proposed in good faith.[7] We address each basis below, and find that the plan is patently unconfirmable.

### 1. Feasibility under § 1129(a)(11)

A plan is confirmable only if it is feasible, *In re Combustion Engineering*, 391 F.3d at 243 n.59, that is, if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Even a planned liquidation "must be feasible." *Accord In re Calvanese*, 169 B.R. 104, 107 (Bankr. E.D. Pa. 1994). The Bankruptcy and District

---

[7] The Bankruptcy and District Courts also found the plan to be unconfirmable on the basis that it is forbidden by law, but because a full analysis of the matter takes us into uncharted waters surrounding issues of state law, we decline to address whether such a third basis also renders the plan unconfirmable.

28

Courts found that the Fifth Plan was not feasible, and we agree.

Although § 1129(a)(11) does not require a plan's success to be guaranteed, *see In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996), the plan must nevertheless propose "a realistic and workable framework[.]" *Hurricane Memphis*, 405 B.R. 616, 624 (Bankr. W.D. Tenn. 2009) (quoting *In re Brice Road Devs.*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008)). In other words, the plan must be "reasonably likely [to] succeed[] on its own terms without a need for further reorganization on the debtor's part." *In re Applied Safety*, 200 B.R. at 584; *see also In re Quigley Co., Inc.*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (plan was not feasible where funding source was "speculative at best and visionary at worst").

In considering feasibility, "a bankruptcy court must evaluate the possible impact of the debtor's ongoing civil litigation[.]" *In re Harbin*, 486 F.3d 510, 519 (9th Cir. 2007). A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely. *Accord In re DCNC N.C. I, LLC*, 407 B.R. 651, 667 (Bankr. E.D. Pa. 2009); *In re Thompson*, No. 92-7461, 1995 WL 358135, at *3-4 (Bankr. E.D. Pa. 1995); *In re Cherry*, 84 B.R. 134, 139 (Bankr. N.D. Ill. 1988); *In re Rey*, Nos. 04-B-35040, 04-B-22548, 06-B-4487, 2006 WL 2457435, at *7 (Bankr. N.D. Ill. Aug. 21, 2006).

Critically, in this case, the Fifth Plan's sole source of funding is the Surcharge, which would be obtained from

29

wholly speculative litigation proceeds. The Fifth Plan also depends on the assumption that Asbestos Claimants will choose to use the CADP rather than the court system, and even then, the Plan will succeed *only if* enough Asbestos Claimants who use the CADP win recoveries and contribute sufficient Surcharge funds to the Plan Payment Fund. This Plan is highly speculative, to say the least, not only because it is contingent on potential litigation winnings, but also because most of the claims have been administratively dismissed and have "thus far been . . . overwhelmingly unsuccessful." *In re Am. Cap. Equip., LLC*, 405 B.R. at 422. The Fifth Plan is simply not reasonably likely to succeed and therefore, is not feasible. Furthermore, the feasibility issue cannot be cured, and no dispute of material fact remains, because Appellants admit that no plan will work without a Surcharge. Thus, the feasibility issue renders the Plan to be patently unconfirmable pursuant to § 1129(a)(11).

### 2. Good Faith under § 1129(a)(3)

A plan is confirmable only if it is proposed in good faith. 11 U.S.C. § 1129(a)(3). The Bankruptcy and District Courts found that the Fifth Plan did not meet the § 1129(a)(3) good faith requirement. We agree.

In analyzing whether a plan has been proposed in good faith under § 1129(a)(3), "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g*, 391 F.3d at 247 (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)). Specifically, under Chapter 11, the two "recognized" policies,

30

or objectives, are "preserving going concerns and maximizing property available to satisfy creditors[.]" *Bank of Am. Nat.'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (citing *Toibb v. Radloff*, 501 U.S. 157, 163, (1991)). More generally, the Bankruptcy Code's objectives include: "giving debtors a fresh start in life," *Walters v. U.S. National Bank of Johnstown*, 879 F.2d 95, 98 (3d Cir. 1989), "discourag[ing] debtor misconduct," *id.*, "the expeditious liquidation and distribution of the bankruptcy estate to its creditors," *Integrated Solutions, Inc. v. Service Support Specialties*, 124 F.3d 487, 489 (3d Cir. 1997), and achieving fundamental fairness and justice. *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 339-43 (3d Cir. 2006).

### a.   *American Capital I*

When we last reviewed Skinner's bankruptcy proceedings in *American Capital I*, we analyzed whether the case was "proceeding in bad faith," *In re Am. Capital Equip., LLC*, 296 F. App'x at 274, or, as the District Court stated, whether the Third Plan "reflected a bad faith use of the bankruptcy process." *In re Am. Capital Equip.*, No. 06-0891, at *9. In so doing, we considered the objectives underlying Chapter 11, and determined based on the record before us at the time that Skinner's bankruptcy case was proceeding in good faith because the Third Plan's surcharge attempted to maximize the property available to satisfy creditors. *In re Am. Capital Equip., LLC*, 296 F. App'x at 274-75. Skinner argues that our initial good faith determination and reasoning circumscribes our good faith determination here. We disagree.

31

A prior determination that a bankruptcy petition was filed or proceeded in good faith does not necessarily preclude a later inquiry into whether a plan under that petition is proposed in good faith for purposes of confirmation. The question of whether a Chapter 11 bankruptcy petition is filed in good faith is a judicial doctrine, distinct from the statutory good faith requirement for confirmation pursuant to § 1129(a)(3). *In re Combustion Eng'g*, 391 F.3d at 247 n.67; 6 Norton Bankr. L. & Prac. § 112:10 (3d ed. 2012). The judicial doctrine inquires into the motivation for proceeding in bankruptcy, *see In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004), and "requires an examination of all of the facts and circumstances and depends upon an amalgam of factors, none of which is dispositive." 6 Norton Bankr. L. & Prac., *supra*, § 112:10. In contrast, "the good-faith confirmation requirement is narrower and focuses primarily on the plan itself," *id.*, and on "whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g*, 391 F.3d at 247. It might be that a bankruptcy case which is filed and proceeds in good faith nevertheless results in a plan that does not fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Furthermore, information affecting the good faith determination might be added to the record throughout the process leading up to confirmation.

We found in *American Capital I* that the use of a surcharge maximizes property available to satisfy creditors, and that Skinner's case was therefore attempting to achieve a valid bankruptcy goal. However, a company may pursue a

32

valid bankruptcy goal, yet in the end, propose a plan that is otherwise inconsistent with the Bankruptcy Code. Thus, the fact that Skinner's case proceeded in good faith with a valid bankruptcy purpose, is not sufficient to assure us at the confirmation stage that the plan itself otherwise comports with the objectives of the Bankruptcy Code.

In *American Capital I*, we did not deal with the same concerns that are now before us; we did not address confirmation, the Fifth Plan, or questions involving fairness, collusion, or conflict of interest. *See generally*, *In re Am. Capital Equip., LLC*, 296 F. App'x at 273-75; *see also In re Am. Capital Equip., LLC*, No. 06-0891, at *10 (JA1380) ("the issue before us is not . . . confirma[tion]"); *id*. at *14 ("We understand that the Insurers viewed this [Third] Plan as an insurance scam. The Insurers might be right. However, these are all issues that will be explored in the adversary proceeding, and, possibly, during plan confirmation proceedings regarding the now viable Fifth Plan."). Thus, our limited discussion in *American Capital I*, regarding whether Skinner was proceeding for purposes of achieving a valid bankruptcy purpose, does not now preclude us from considering whether the Fifth Plan will fairly achieve its purposes, and whether it is otherwise consistent with the objectives and purposes of the Bankruptcy Code. We turn now to these questions.

#### b. The Fifth Plan

A plan is proposed in good faith only if it will "*fairly* achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g*, 391 F.3d at

33

247 (emphasis added); *see also Young v. United States*, 535 U.S. 43, 50 (2002) ("[B]ankruptcy courts . . . are courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'" (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)). The Bankruptcy and District Courts found that the Fifth Plan was not proposed in good faith because it was collusive. *In re Am. Capital Equip., Inc.*, 405 B.R. at 422-23; *Skinner Engine Co.,* No. 09-0886, 2010 WL 1337222, at *1. We agree that collusive plans are not in good faith and do not meet the good faith requirement of § 1129(a)(3). *See In re PWS Holding Corp.*, 228 F.3d at 242-43 (proceeding with a good faith analysis under § 1129(a)(3) where collusion was the only alleged basis for arguing that the plan was not proposed in good faith). However, we are not convinced the Fifth Plan is collusive because insurers have not pointed to any evidence of an agreement to defraud insurers. *Cf.* Black's Law Dictionary (9th ed. 2009) (Collusion is "[a]n agreement to defraud another or to do or obtain something forbidden by law."); *Lincoln Printing Co. v. Middle W. Utils. Co.*, 74 F.2d 779, 784 (7th Cir. 1935) ("Collusion is . . . an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain any object forbidden by law[.]") (internal quotation marks and citation omitted). The Bankruptcy Court, in fact, noted that "collusion" might not be the proper term for the Fifth Plan's good faith problem. *In re Am. Capital Equip., Inc.*, 405 B.R. at 423.

Nonetheless, we agree that the Fifth Plan will not fairly achieve the Bankruptcy Code's objectives because it establishes an inherent conflict of interest under

circumstances that are especially concerning. *Cf. Coram Healthcare*, 271 B.R. 228, 234-35 (Bankr. D. Del 2001) (finding § 1129(a)(3) good faith violation where debtor's CEO had an interest in one of Debtors' largest creditors).

First, as the Bankruptcy Court stated, the Fifth Plan sets up a system in which Skinner would be "financially incentivized to sabotage its own defense." *In re Am. Capital Equip., Inc.*, 405 B.R. at 423. Skinner is a defunct business without so much as a single employee remaining. It has no assets to distribute to creditors or attorneys, and Skinner admits that the only way that creditors and attorneys can possibly be paid is if asbestos litigants win settlements against it (and pay the Surcharge). Although settlements will be controlled by a Plan Trustee with no financial interest in the outcome of the proceedings, it is not as if Skinner can entirely remove itself from the process. Rather, these settlements will likely require Skinner's involvement in both defense and discovery because the question of asbestos claimants' exposure to Skinner products is still at issue. Thus, the Fifth Plan creates an inherent conflict of interest: Skinner is required to cooperate in its defense, but will be incentivized to do otherwise.

Second, we are troubled by the fact that the CADP system creates this inherent conflict, while at the same time severely limiting or eliminating Insurers' ability to take discovery, submit evidence, contest causation, or appeal a decision, and all without the protective channeling injunction of § 524(g). Appellants argue that similar provisions reducing insurers' procedural rights have been confirmed under other plans, but fail to cite to any plans that

35

simultaneously employed a similar surcharge. In fact, Appellants do not cite to *any* examples of confirmed bankruptcy plans that sought to pay creditors using insurance dollars intended to compensate Asbestos Claimants for their personal injuries.

Finally, we are unconvinced by Appellants' attempts to compare the Fifth Plan with a § 524(g) trust, because the structure and objectives of a § 524(g) trust are inconsistent with the trust created under the Fifth Plan. Although like a § 524(g) trust, the Fifth Plan sets up a process for Asbestos Claimants to settle claims out of court, the similarities end there. A § 524(g) trust is "funded in whole or in part by the securities of [one] or more debtors . . . and by the obligation of such debtor or debtors to make future payments, including dividends[.]" 11 U.S.C. § 524(g)(2)(B)(i)(II). The trust fund is then used to pay Asbestos Claimants. § 524(g)(2)(B)(i)(I), (IV). The trust maximizes the value of the debtor's estate for creditors by allowing a debtor to channel all asbestos claims into the trust, so that the debtor and its affiliates or parent companies are not burdened by the asbestos claims. § 524(g)(1)(A), (4)(A)(ii); *see also* Eric D. Green, James L. Patton, Jr., & Edwin J. Harron, *Future Claimant Trusts and "Channeling Injunctions" to Resolve Mass Tort Environmental Liability in Bankruptcy: The Met-Coil Model*, 22 Emory Bankr. Dev. J. 157, 160-64 (2005) (explaining that the § 524(g) channeling injunction increases investor confidence, and thus better enables the reorganized enterprise to meet creditor obligations and provide for future claimants). Ideally:

36

> "[T]he [bankrupt] company remains viable. . . . [and] continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims."

*In re Combustion Eng'g*, 391 F.3d at 248 n.69 (quoting 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Brown)); *see also id.* at 248 (The bankrupt company continues "to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants."); *but cf.* Sander L. Esserman & David J. Parsons, *The Case for Broad Access to 11 U.S.C. 524(g) in Light of the Third Circuit's Ongoing Business Requirement Dicta in* Combustion Engineering, 62 N.Y.U. Ann. Surv. Am. L. 187 (2006) (arguing that future payments are not always necessary and that in some cases, a present contribution of securities may be sufficient under § 524(g)). Essentially, the § 524(g) trust "recognizes the inherent equitable power of the bankruptcy courts to provide for equitable treatment of all of a debtor's creditors, including those having claims arising out of asbestos products." 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Graham); *see also In re. Federal-Mogul Global Inc.*, Nos. 09-2230 & 09-2231, 2012 WL 1511773, at *1-3, 14-16 (3d Cir. May 1, 2012).

In contrast, the CADP system does not create a trust funded by Skinner's securities to pay future Asbestos Claimants, but rather, it creates a Plan Payment Fund funded by Asbestos Claimants to pay attorneys and other creditors.

There is no channeling injunction to protect the debtor or insurers from future claimants, and the debtor makes no contribution whatsoever to the trust, but rather plans to pull money *from* it. Indeed, the only alleged benefit the CADP provides to Asbestos Claimants appears to be the ability to pursue claims through the CADP rather than through the court system.

We recognize that at times, a bankruptcy court's equitable powers under § 105(a) might allow it to confirm an asbestos trust not provided for by § 524(g), but its "general grant of equitable power . . . must be exercised within the parameters of the Code itself," *In re Combustion Eng'g*, 391 F.3d at 236, and for the purpose of "achiev[ing] fairness and justice in the reorganization process." *Id*. at 235 (internal quotation omitted); *see also In re Kaiser Aluminum Corp.*, 456 F.3d at 340 (Equity allows courts to "craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the Code was designed to obtain[.]" (quoting *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003))). However, we fail to see how the Bankruptcy Code's equitable purposes would be achieved by the Fifth Plan.

We do not here define the parameters of a bankruptcy court's equitable powers, nor determine that surcharges, or alternative forms of asbestos trusts, or other individual provisions of the Fifth Plan, are never permissible under § 1129(a)(3). However, under the circumstances of this plan, where: (1) the debtor's bankruptcy is unrelated to asbestos litigation, (2) the debtor will not contribute to the Plan

38

Payment Fund but merely pull from it, (3) Asbestos Claimants provide the sole source of funding to the Plan Payment Fund through the Surcharge, (4) the Plan Payment Fund exists solely to pay off creditors and insurers rather than to pay future asbestos litigants or generate profits to do so, and where (5) the Surcharge creates an inherent conflict of interest while (6) the CADP process simultaneously strips Insurers of certain procedural and substantive rights without the protections of § 524(g), we find a lack of good faith as required for confirmation under § 1129(a)(3). The mere provision of an alternative settlement process cannot outweigh our concerns.[8]

---

[8] Appellants respond with several *non sequiturs*. They argue that they sought Insurers' help to develop a consensual plan, but that does not mean that the plan eventually proposed fairly achieved the objectives and purposes of the Bankruptcy Code. They also argue that the surcharge is not problematic because it is an arms-length transaction and fully disclosed, but neither issue is dispositive as to whether a conflict-of-interest or collusive type of system exists. *See*, *e.g.*, *Moody v. Sec. Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1065 (3d Cir. 1992) (noting that unfair influence may exist regardless of whether a transaction appears to be at arms-length); *In re ACandS, Inc.*, 311 B.R. 36, 39-43 (Bankr. D. Del. 2004) (finding a plan to be not in good faith despite the fact that Asbestos Claimants' control over the debtor was disclosed). Finally, Appellants argue that their plan is not in bad faith because it fulfills a purpose of the Bankruptcy Code (namely, maximizing value to creditors). (Skinner Reply Br. at 2-4;

39

Appellants fail to meet their burden of showing that the plan might be confirmable after further discovery or creditor voting. No dispute of material fact remains that could affect this plan's good faith standing, and although creditor voting could potentially address certain concerns, such as CADP procedures, it cannot address the majority of the concerns and certainly cannot cure the inherent conflict of interest. Thus, the lack of good faith pursuant to § 1129(a)(3) makes the Fifth Plan patently unconfirmable.

C.

Finally, Appellants claim that the Bankruptcy Court abused its discretion by converting the Chapter 11 case to a Chapter 7. We disagree. After providing "notice and a hearing," a bankruptcy court "may convert a case under [Chapter 11] to a case under Chapter 7 of this title or may dismiss a case under [Chapter 11], whichever is in the best

---

Bartel's Br. at 37-38; Skinner's Br. at 26-27.) However, the fact that there is at least one valid purpose to the Plan is not dispositive as the Plan could fulfill one specific purpose of the Code and yet be inconsistent with other overarching principles, or with the requirement that objectives and purposes of the Code must be fairly achieved.

interest of creditors and the estate, for cause." 11 U.S.C. § 1112(b) (2004).[9]

Section 1112(b) requires a two-step process in which the court first determines whether there is "cause" to convert or dismiss, and next chooses between conversion and dismissal based on "the best interest of creditors and the estate." § 1112(b); *In re SGL Carbon Corp.*, 200 F.3d 154, 159 n.8 (3d Cir. 1999). We review the decision to convert a case pursuant to § 1112(b) for abuse of discretion. *See id.* at 159 (reviewing for abuse of discretion the decision to dismiss a case pursuant to § 1112(b)); *see also In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984) ("[T]he determination of cause under § 1112(b) is subject to judicial discretion under the circumstances of each case." (internal quotation marks and citation omitted)).

As a threshold matter, the hearing on May 7, 2009 met § 1112(b)'s preliminary requirement for "notice and a hearing." The April 9, 2009 Order scheduling the May 7 hearing stated that the issue of conversion would be considered. Furthermore, the hearing provided parties with an opportunity to present their arguments regarding conversion. *Cf. In re Blumenberg*, 263 B.R. 704, 716-17

---

[9] The 2005 and 2010 amendments to the statute require that in given circumstances "the court *shall*" convert or dismiss a case. 11 U.S.C. § 1112 (2005) (emphasis added); 11 U.S.C. § 1112 (2011) (emphasis added). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, § 1501, 119 Stat. 23, 216 (2005).

(Bankr. E.D.N.Y. 2001) (Even though a formal hearing was not held, the court found the "notice and hearing" requirement to be met because the debtor was provided with "ample opportunities through both extended oral argument and formal motion practice to explain why his bankruptcy case should not be dismissed.").

Turning next to the two-step analysis under § 1112(b), we agree with the District Court that the Bankruptcy Court did not abuse its discretion in finding cause to convert the case to Chapter 7. Section 1112(b) provides a non-exhaustive list of grounds for finding "cause" to convert or dismiss. 11 U.S.C. § 1112(b)(1)-(10)(2004); *In re SGL Carbon Corp.*, 200 F.3d at 160 (finding that the list is not exhaustive). The list of examples includes "inability to effectuate a plan[.]" 11 U.S.C. § 1112(b)(2) (2004).[10] A court may also find cause where there is not "a reasonable possibility of a successful reorganization within a reasonable period of time." *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991). The amount of time that is considered reasonable varies. *See*, *e.g.*, *DCNC N.C. I, L.L.C. v. Wachovia Bank*, Nos. 09-3775, 09-3776, 2009 WL 3209728, at *2-3 (E.D. Pa. Oct. 5, 2009) (four months); *In re Camden Ordnance Mfg. Co. of Ark., Inc.*, 245

---

[10] Although the statute no longer lists this as an example of "cause," the amended statute does not apply in this case, and even if it did, the "'[i]nability to effectuate a plan' remains a viable basis for dismissal because the listed examples of cause are not exhaustive." *DCNC N.C. I, L.L.C. v. Wachovia Bank*, Nos. 09-3775, 09-3776, 2009 WL 3209728, at *5 (E.D. Pa. Oct. 5, 2009).

B.R. 794, 797 (E.D. Pa. 2000) (three months); *In re Halvajian*, 216 B.R. 502, 513 (D.N.J. 1998) (22 months), *aff'd*, 168 F.3d 478 (3d Cir. 1998).

We find that the Bankruptcy Court did not abuse its discretion in determining that there was cause to convert on the basis that Appellants have been unable to propose a confirmable plan, and will be unable to do so in the future. *See In re Am. Cap. Equip., LLC*, 405 B.R. at 426-27. The Fifth Plan is not feasible, and Appellants have been unable to create a plan that is not contingent on future litigation with an uncertain and speculative outcome. Additionally, Appellants concede that the plan cannot be successful without a Surcharge, which, in this case, creates an inherent conflict of interest.

Appellants argue that they did not have reasonable time to effectuate a plan, given delays by Insurers, and the "complexities of mass-tort bankruptcy cases." However, Insurers were not the only cause for delay; Skinner sought to stay proceedings, missed filing deadlines, sought multiple extensions, and filed five Chapter 11 plans. Furthermore, this case is not truly a "mass-tort bankruptcy case" despite Skinner's attempts to frame it as such. Skinner's bankruptcy was not caused even in part by mass-tort personal injury claims, and Skinner seeks a settlement of the asbestos claims only in an attempt to access injured third parties' insurance recoveries. Regardless, Skinner does not explain why even a complex case should be kept alive once it is clear that any plan will be futile.

43

By the time this case was dismissed, Skinner had been given more than five years to propose a confirmable plan, and had been unable to do so. *In re Am. Capital Equip.*, 405 B.R. at 427. A court "is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *In re Brown*, 951 F.2d at 572 (quoting *Tenn. Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18, 22 (1936)). A court may permit a debtor to modify and resubmit its plan under § 1127(a), but is not necessarily required to do so, especially where modification would be futile. *See*, *e.g.*, *In re Brauer*, 80 B.R. 903, 911 (N.D. Ill. 1987) (where bankruptcy court dismissed Chapter 11 case "without first resorting to lesser sanctions[,]" such "'omissions' were not an abuse of discretion"). We agree with the reasoning that where "repeatedly unsuccessful attempts at confirmation are likely to generate enormous administrative costs, often without increasing the likelihood of success, § 1112(b) recognizes the court's ability to curtail the process through the ultimate conversion or dismissal of the case[,]" and to make sure the plan "does not outlive the likelihood of its usefulness." *In re Rand*, No. AZ-10-1160, No. 07-06801, 2010 WL 6259960, at *5 (9th Cir. B.A.P. Dec. 7, 2010) (citing 3 *Collier Bankr. Manual* ¶ 1112.04[4][l] (3d ed. rev. 2010)). Under the circumstances, the Bankruptcy Court gave Skinner ample time to develop a plan given that Skinner did not demonstrate "a reasonable possibility" of developing a confirmable Chapter 11 plan "within a reasonable period of time." *In re Brown*, 951 F.2d at 572.

Finally, once cause has been established, "the court may convert . . . or may dismiss a case under [Chapter 11], whichever is in the best interest of creditors and the estate[.]"

44

11 U.S.C. § 1112(b) (2004).  A bankruptcy court has "wide discretion" to "use its equitable powers" to "make an appropriate disposition of the case[.]"  *In re Camden Ordnance*, 245 B.R. at 803 (citing the legislative history of § 1112(b)).

Here, the Bankruptcy Court did not address the best interest of creditors and the estate directly, but it is clear that it determined that no future plan would be able to be effectuated under Chapter 11.  The obvious result is that under the Bankruptcy Court's reasoning, neither creditors nor the estate could conceivably benefit if a Chapter 11 plan could never be effectuated.  Generally, bankruptcy courts should explicitly address the best interest of creditors and the estate under § 1112(b), but we find that the Bankruptcy Court did not abuse its discretion under the circumstances.

Prolonging this case will only burden the estate with mounting attorney and administrative fees.  *Cf. Matter of Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir.1995) ("[N]either the trustee in bankruptcy nor the trustee's lawyer has a duty to collect an asset of the debtor's estate if the cost of collection would exceed the value of the asset.  His duty is to endeavor to maximize the value of the estate, which is to say the *net* assets.  The performance of this duty will sometimes require him to forbear attempting to collect a particular asset, because the costs of collection would exceed the asset's value." (internal quotation marks and citations omitted)).  A Chapter 7 bankruptcy can be accomplished more efficiently, thus halting the mounting liabilities against the estate.  Moreover, Skinner will not be discharged of its liabilities under Chapter 7, 11 U.S.C. § 727(a)(1), and

45

Chapter 7 trustees have the ability to settle an estate's claims, including claims regarding insurance coverage. *See*, *e.g.*, *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 347-48 (3d Cir. 1999) (discussing settlement of a lawsuit by a Chapter 7 trustee); *In re Turner*, 274 B.R. 675, 681-82 (Bankr. W.D. Pa. 2002) (approving settlement agreed to when insurer's liability was unclear); Order Approving Settlement Agreement By and Between the Trustee and the Hartford Insurers, *In re Peanut Corp. of Am.*, No. 09-bk-60452 (Bankr. W.D. Va. Oct. 2, 2009) (settlement for insurance coverage for mass-tort claims). Creditors may be unlikely to be paid under Chapter 7, but the status quo is no better, because Skinner cannot propose a confirmable plan under Chapter 11.

Furthermore, Asbestos Claimants' compensation in this case is not contingent on confirmation of a Chapter 11 plan. Asbestos Claimants' recovery will be unaffected by the type of bankruptcy that is approved. Skinner's estate is defunct, and regardless of whether a Chapter 7 or Chapter 11 is approved, any asbestos-related personal injury recovery to be had will come from Insurers, who will not be released from liability due to Skinner's bankruptcy. *See* 40 Pa. Cons. Stat. § 117; Ohio Rev. Code Ann. § 3929.05; *H.K. Porter Co., Inc. v. Pa. Ins. Guar. Ass'n*, 75 F.3d 137, 142 (3d Cir. 1996) ("[U]nder Pennsylvania's 'direct action' statute, [40 Pa. Cons. Stat. § 117,] tort victims may sue an insurer directly if the insured has gone bankrupt or become insolvent."); *Phila. Forrest Hills Corp. v. Bituminous Cas. Corp.*, 222 A.2d 493, 494 (Pa. Super. Ct. 1966) ("40 [Pa. Cons. Stat.] § 117, authorizes direct actions against an insurance liability carrier in the event of the insolvency or bankruptcy of the insured.");

46

*Fisher v. Lewis*, 567 N.E. 2d 276, 278 (Ohio Ct. App. 1988) ("[A]n insurance company can be held liable under its contract for a judgment against its insured notwithstanding the discharge in bankruptcy of the insured."). Thus, contrary to Appellants' argument, Insurers will not receive a windfall under Chapter 7. We find no abuse of discretion in the Bankruptcy Court's decision to convert this case to a Chapter 7.

IV.

In sum, we find that the Bankruptcy Court did not err in determining based on the disclosure statement hearing that the Fifth Plan was patently unconfirmable under § 1129(a)(3) because its success is entirely contingent on speculative future litigation, and because the Plan asks third-party Asbestos Claimants, who were not a cause of the bankruptcy, to serve as the sole funding source for attorneys and other creditors, under circumstances involving an inherent conflict of interest and inequitable procedural provisions. The Fifth Plan is simply not confirmable, and given the apparent futility in Skinner's pursuit of a plan under Chapter 11, as well as the mounting liabilities against the estate, the Bankruptcy Court did not abuse its discretion by converting the case to Chapter 7.

For the foregoing reasons, we will affirm.

47