PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
————

Nos. 12-2923 and 12-3143
————

In Re:  WR Grace & Co., et al., Debtors

Anderson Memorial Hospital,

Appellant
————

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-11-cv-00199)
District Judge:  Honorable Ronald L. Buckwalter
————

Argued June 17, 2013
Before:  AMBRO, FISHER and JORDAN, *Circuit Judges*.

(Filed: September 4, 2013)

Christopher D. Loizides, Esq.
Loizides & Associates
1225 King Street
Suite 800
Wilmington, DE  19801

David L. Rosendorf, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce De Leon Boulevard
9th Floor
Miami, FL  33134

Daniel A. Speights, Esq.
Speights & Runyan
200 Jackson Avenue East
P.O. Box 685
Hampton, SC 29924-0000
     *Counsel for Appellant, Anderson*
     *Memorial Hospital*


John Donley, Esq. **(Argued)**
Lisa G. Esayian, Esq.
Adam C. Paul, Esq.
Kirkland & Ellis
300 North LaSalle Street
Chicago, IL  60654

Laura D. Jones, Esq.
Kathleen P. Makowski, Esq.
James E. O'Neill, III, Esq.
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE  19801

Christopher Landau, Esq.

Kirkland & Ellis
655 15th Street, N.W., Suite 1200
Washington, DC 20005
    *Counsel for W.R. Grace, Official*
    *Committee of Equity Security Holders,*
    *David T. Austern and Garlock*
    *Sealing Technologies, LLC*

Roger J. Higgins, Esq.
Suite 2800
111 East Wacker Drive
Chicago, IL 60601
    *Counsel for W.R. Grace, Official*
    *Committee of Equity Security Holders,*
    *David T. Austern, Garlock Sealing*
    *Technologies, LLC and John M. Thomas*

Andrew N. Rosenberg, Esq. **(Argued)**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019
    *Counsel for David T. Austern,*
    *Her Majesty Queen of Canada*

Kevin J. Mangan, Esq.
Francis A. Monaco, Jr., Esq.
Matthew P. Ward, Esq.
Womble, Carlyle, Sandridge & Rice
222 Delaware Avenue, Suite 1501

Wilmington, DE  19801
*Counsel for Her Majesty Queen*
*of Canada, Official Committee*
*of Equity Security Holders,*
*David T. Austern, CNA Financial*
*Corp. Loews and State of Montana*

Philip Bentley, Esq.
Kramer, Levin, Naftalis & Frankel
1177 Avenue of the Americas
New York, NY  10036
*Counsel for Official Committee*
*of Equity Security Holders,*
*David T. Austern and*
*John M. Thomas*

Garland S. Cassada, Esq.
Susan M. Huber, Esq.
Richard C. Worf, Jr., Esq.
Robinson Bradshaw & Hinson
101 North Tryon Street, Suite 1900
Charlotte, NC  28246

Brett D. Fallon, Esq.
Morris James
500 Delaware Avenue ,Suite 1500
Wilmington, DE  19081
*Counsel for Official Committee*
*Equity Security Holders,*
*David T. Austern and Garlock*
*Sealing Technologies, LLC*

Teresa K.D. Currier, Esq.
Saul Ewing
222 Delaware Avenue
P.O. Box 1266, Suite 1200
Wilmington, DE  19899
     *Counsel for Official Committee*
     *of Equity Security Holders and*
     *David T. Austern*

Roger L. Frankel, Esq.
Orrick, Herrington & Sutcliffe
1152 15th Street, N.W.
Columbia Center
Washington, DC  20005

Richard H. Wyron, Esq.
Orrick, Herrington & Sutcliffe
1152 15th Street, N.W.
Columbia Center
Washington, DC  20005
     *Counsel for David T. Austern*

Alan B. Rich, Esq. **(Argued)**
Suite 4244
1201 Elm Street
Dallas, TX  75270
     *Counsel for Property Damage*
     *Future Claims Representative*

Elizabeth M. DeCristofaro, Esq.

Ford, Marrin, Esposito, Witmeyer & Gleser
88 Pine Street
23rd Floor, Wall Street Plaza
New York, NY  10005

Michael S. Giannotto, Esq.
Frederick C. Schafrick, Esq.
Goodwin Procter
901 New York Avenue, N.W.
Suite 900 East
Washington, DC  20001
     *Counsel for Continental Casualty Co.*

Elisa Alcabes, Esq.
Mary Beth Forshaw, Esq.
Andrew T. Frankel, Esq.
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY  10017

Neal J. Levitsky, Esq.
Seth A. Niederman, Esq.
Fox Rothschild
919 North Market Street
Citizens Bank Center, Suite 1300
Wilmington, DE  19801
     *Counsel for Travelers Casualty*
     *& Surety Co.*

Mark T. Hurford, Esq.
Campbell & Levine

222 Delaware Avenue, Suite 1620
Wilmington, DE  19801

Peter V. Lockwood, Esq.
Caplin & Drysdale
Suite 1100
One Thomas Circle, N.W.
Washington, DC 20005
     *Counsel for Official Committee of*
     *Asbestos Personal Injury Claimants*

Edward C. Toole, Jr., Esq.
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103
     *Counsel for BNSF Railway Co.*

Matthew S. Owen, Esq.
Ashley C. Parrish, Esq.
Carolyn M. Sweeney, Esq.
King & Spalding
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC  20006

Thaddeus D. Wilson, Esq.
King & Spalding
1180 Peachtree Street
Atlanta, GA  30309
     *Counsel for Proposed Amicus*

*Imperial Tobacco Canada Ltd.*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

Anderson Memorial Hospital ("AMH") first filed suit against W.R. Grace and its affiliates ("Grace")[1] in South Carolina state court in 1992, seeking class-wide redress for property damage caused by asbestos-containing products that Grace had manufactured. Before the resolution of that litigation, Grace filed a petition for Chapter 11 protection. The Bankruptcy Court supervised nearly a decade of related litigation. Most property damage claims against Grace had been settled by 2010, contingent on the approval of an 11 U.S.C. § 524(g) trust and an injunction channeling property damage claims against Grace to that trust for payment. AMH, however, did not settle. The Bankruptcy Court confirmed Grace's reorganization, including a trust and channeling injunction, over AMH's objections. The District Court affirmed.

AMH appeals from the orders confirming Grace's Chapter 11 Plan and approving the trust and channeling injunction. AMH argues that (A) the Plan does not meet the

_____

[1] Appellee Grace consists of sixty-two related corporate entities. For ease of reference, the debtors are collectively referred to hereinafter as "Grace."

8

requirements of § 524(g), which provides a mechanism for handling overwhelming asbestos-related liabilities in the Chapter 11 process, (B) the Plan fails to provide equal treatment pursuant to § 1123(a)(4), (C) Grace has not shown that the Plan was proposed in good faith pursuant to § 1129(a)(3), and (D) Grace has not shown that the Plan is feasible pursuant to § 1129(a)(11). On each of these issues, we will affirm the judgment of the District Court.

## I.

One aspect of Grace's business is extracting natural resources, refining them, and converting them into manufactured materials used for building construction and insulation. Since the 1980s, Grace has defended itself against hundreds of asbestos-related lawsuits filed by building owners seeking redress for the costs involved in removing Grace products.

AMH owns a hospital complex in Anderson, South Carolina, that used Grace products in its construction. In 1992, AMH filed a class action lawsuit against Grace seeking compensation for asbestos-related property damage in South Carolina state court. The South Carolina court struck out-of-state class members from the AMH complaint—a decision that was not immediately appealable under South Carolina law. *Anderson Memorial Hosp. v. W.R. Grace & Co.*, 1994 WL 1744074 (S.C. Ct. Com. Pl. Aug, 8, 1994). AMH amended its complaint to exclude non-South Carolina buildings and to include damage caused by all kinds of asbestos-containing surfacing material produced by Grace. The South Carolina Circuit Court conditionally certified this

class in February 2001. AMH Appendix ("AMHA") at 700193. Grace sought Chapter 11 protection two months later on April 2, 2001, before notice of the South Carolina action had issued to class members.

Early in the Chapter 11 proceedings, Grace sought to establish a bar date for property damage claims and a process for handling related litigation. In April 2001, personal injury ("PI") and property damage ("PD") committees were appointed. The Bankruptcy Court requested proposals in May 2001 for case management plans and the scheduling of the asbestos-related claims.

After the March 31, 2003 deadline for filing claims was established, more than 4,000 traditional PD claims were filed.[2] Speights & Runyan ("S&R"), counsel for AMH, filed three proofs of claim, including a worldwide class claim, a statewide class claim, and an individual claim. S&R attached

_____

[2] In addition to traditional PD claims, Grace also faced Zonolite Attic Insulation ("ZAI") claims based on damages from a loose-fill attic insulation manufactured by Grace that allegedly contained asbestos. The ZAI litigation included a "science trial" (where court-appointed counsel represented the individual claimants, at Grace's expense) and a Bankruptcy Court ruling that, although ZAI did contain some asbestos, it did not pose an unreasonable risk. After this decision, the Bankruptcy Court approved a settlement (negotiated in September 2008) that would allow future US ZAI PD claims to be channeled to the Asbestos PD Trust as part of Class 7B.

10

a list of 3,000 putative claimants (including 121 South Carolina claimants) to its worldwide class claim. S&R also filed an individual proof of claim for each of the potential class members it could identify through Grace's sales records. Grace asserts that approximately 2,000 of the individual claims were filed without any authority from the purported claimant.

Grace filed a Notice of Intent to Object to the PD claims, and some claimants then came forward to object that AMH's counsel had filed claims in their names without authorization. Grace asked S&R to withdraw these claims. The number of PD claims was ultimately reduced from more than 4,000 to 1,670, in part because S&R withdrew 586 claims improperly filed on behalf of class claimants and 1,500 claims that lacked an evidentiary basis. S&R also withdrew approximately 550 additional claims for various other reasons. The parties litigated some additional claims in which S&R's authority was questioned; the Bankruptcy Court disallowed those claims, a ruling that the District Court and this Court later affirmed. *In re W.R. Grace & Co.*, 366 B.R. 302 (Bankr. D. Del. 2007), *aff'd*, *Mission Towers v. W.R. Grace & Co.*, 2007 WL 4333817 (D. Del. Dec. 6, 2007), *aff'd*, *In re W.R. Grace & Co.*, 13 F. App'x 134 (3d Cir. 2009). In response to these objections, AMH moved for class certification. That motion was denied on May 29, 2008, and the District Court declined to give leave to appeal—a ruling we declined to review on an interlocutory basis. *In re W.R. Grace & Co.*, 389 B.R. 373, 380 (Bankr. D. Del. 2008), *leave to appeal denied*, *In re W.R. Grace & Co.,* 2008 WL 4234339, *2 (D. Del. Sept. 4, 2008), *interlocutory appeal*

*denied*, *In re W.R. Grace & Co.*, No. 08-4829 (3d Cir. Dec. 14, 2009).

Throughout the Chapter 11 process, various parties engaged in settlement negotiations. In fall 2004, an initial settlement effort including S&R failed. In 2006, the late District Judge Samuel Pointer led a mediation including S&R, but the parties did not reach a settlement.

In fall 2006, Grace began to litigate the remaining PD claims. All but 90 of these claims had been withdrawn, disallowed, or settled (contingent on the confirmation of a § 524(g) plan) by February 2009. By the time the District Court issued its opinion in 2012, Grace had settled a total of 407 PD claims (including 119 PD claims S&R agreed to settle) for approximately $150.8 million to be paid in full on the Plan's effective date, assuming a § 524(g) trust is approved.

With the consent of the committee of asbestos PD claimants, Plan Proponents obtained the appointment of Judge Alexander Sanders as a representative of future PD claimants. Plan Proponents negotiated with Judge Sanders and came to an agreement regarding the Plan's treatment of traditional PD claims. Successive drafts of the Plan were circulated to all counsel, and comments were invited. AMH did not provide comments. AMH, for its part, asserts that the Plan was actually the result of a deal negotiated in April 2008 by Grace, the Equity Committee, the PI Committee, the PI future claims representative, and the PI lead negotiator—all without PD participation.

12

The Plan was filed on February 27, 2009 and subsequently amended several times. With respect to the present and future traditional (non-ZAI) asbestos PD claims making up Class 7A, it provides:

"(i) *Treatment of Claims in Class 7A.* Each Holder of an Asbestos PD Claim in Class 7A that is Allowed as of the effective date pursuant to a PD Settlement Agreement, or other stipulation, order, or agreement, shall be paid the Allowed Amount of its Allowed Asbestos PD Claim in Cash in full by the Asbestos PD Trust as and when due, without any deduction, proration, reduction, setoff or discount, pursuant to the terms of the respective PD Settlement Agreements, or other stipulation, order, or agreement, and the terms of the Asbestos PD Trust Agreement (which Asbestos PD Trust shall be deemed by this Plan, the Confirmation Order, and the Asbestos PD Trust Agreement to have assumed the obligations of such PD Settlement Agreements). Unresolved Asbestos PD Claims shall be paid pursuant to the following procedures:

(A) In connection with confirmation of the Plan, the Court shall enter the Class 7A CMO [i.e., case management order]; and

(B) Allowed Unresolved Asbestos PD Claims shall be paid in full, in Cash, by the Asbestos

13

PD Trust pursuant to the terms of the Asbestos PD Trust Agreement.

(C) All Allowed Asbestos PD Claims in Class 7A shall be paid in full by the Asbestos PD Trust solely from the Asbestos PD Trust Assets that are designated for Class 7A Claims.

(D) The inclusion of Demands as Asbestos PD Claims in Class 7A and any reference to Demands related to Asbestos PD Claims in Class 7A in the Plan does not constitute an admission by the Debtors and the other Plan Proponents that an Entity which did not have an allowable Asbestos PD Claim in Class 7A against the Debtors as of the effective date could assert a valid claim against the Asbestos PD Trust contemplated under the Plan, and all rights and defenses to the allowance of such a claim by the Asbestos PD Trust are expressly reserved pursuant to the Plan."

Joint Appendix ("JA") at 200078-79.

Following the Plan's effective date, the PD trust will be funded with the amount of cash specified in the Plan to pay allowed PD claims. Reorganized Grace will have an ongoing obligation to fund the PD Trust for all traditional PD claims allowed in the future.

Approximately 98.99 percent of Class 7A voted to accept the Plan. JA at 201376. AMH challenged the

14

confirmation of the Plan. At the confirmation hearing, the Bankruptcy Court heard evidence on, among other things, the issue of good faith. AMH suggests that Grace essentially put on no evidence to support the conclusion that the Plan was filed in good faith and instead asserted that good faith could be determined based on the documents themselves. Grace's assistant general counsel, Richard Finke, was eventually called to testify, but the Bankruptcy Court concluded that if he were allowed to give testimony on Grace's intentions throughout the Chapter 11 proceeding, the confirmation hearing would have to be continued to allow for discovery on the negotiating process. The Plan Proponents did not then offer Finke's testimony but instead offered the pre-negotiated proffer that did not delve into Plan Proponents' subjective intent.

The Bankruptcy Court also heard evidence on the Plan's compliance with the statutory requirements for channeling asbestos claims to a trust. A § 524(g) injunction is only appropriate where the debtor is likely to be subject to significant future demands. Plan Proponents offered the testimony of economist Dr. Denise Martin on this issue. Dr. Martin analyzed future events that might trigger additional property damage demands. She testified that Grace was likely to be subject to substantial future demands, but that the amount and timing of those demands could not be determined. The Bankruptcy Court credited her testimony.

Additionally, investment banker Pamela Zilly testified as an expert on the feasibility of the Plan, concluding that the Plan is feasible "in light of Grace's historical performance, reasonable projections, management initiatives, and proposed

15

exit financing." Grace Br. at 17; *see also* JA at 201747. Although Grace's internal projections valued future PD liabilities at $37.3 million,[3] Zilly testified that Grace's performance and financial track record would give the reorganized company the ability to satisfy up to $1.6 billion in asbestos PD liabilities over 25 years if necessary.

Over AMH's objections, the Plan was confirmed. The District Court affirmed the Confirmation Orders on appeal. *In re Grace & Co.*, 475 B.R. 34 (D. Del. 2012), *superseding In re W.R. Grace & Co.*, 468 B.R. 81 (D. Del. 2012). In light of our decision in *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012), AMH asked the District Court to reconsider its opinion. The District Court declined on July 23, 2012. *In re W.R. Grace & Co.*, 476 B.R. 114 (D. Del. 2012). AMH's timely appeal of the District Court's affirmance of the Confirmation Orders and of its denial of its motion for relief followed.

## II.

The Bankruptcy Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and the District Court had appellate jurisdiction over the Bankruptcy Court decision under 28 U.S.C. §§ 158(a) and 1334(b). We have

---

[3] Grace has established a reserve account in this amount to cover future PD claims and any defense costs associated with litigating those claims after the Plan's effective date. The record does not indicate how Grace arrived at its $37.3 million projection.

16

jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. "We review the District Court's conclusions of law de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.19 (3d Cir. 2004).

## III.

AMH appeals from the District Court's affirmance of the Bankruptcy Court orders confirming Grace's Chapter 11 Plan of reorganization and approving a trust and channeling injunction under 11 U.S.C. § 524(g). AMH argues that (A) the Plan does not meet the requirements of § 524(g), (B) the Plan fails to provide equal treatment, (C) Grace has failed to demonstrate that the Plan was proposed in good faith, and (D) Grace has not shown that the Plan is feasible. Each of these objections fails, and we will affirm the District Court.

## A.

Section 524(g) provides a mechanism that allows companies to handle overwhelming present and future asbestos liability through a trust created in conjunction with a Chapter 11 bankruptcy plan. *See* Katherine M. Anand, Note, *Demanding Due Process: The Constitutionality of the § 524 Channeling Injunction and Trust Mechanisms That Effectively Discharge Asbestos Claims in Chapter 11 Reorganization*, 80 Notre Dame L. Rev. 1187, 1192 (2005). AMH argues that the reorganization plan does not comply with the statutory requirements for a § 524(g) injunction and trust because (1) Grace did not demonstrate that it was likely to be subject to future PD demands, (2) Grace did not

17

demonstrate that the plan's procedures were necessary to deal equitably with claims and future demands, and (3) the procedures treat similar claims differently. For the reasons discussed below, none of these arguments succeeds.

1.

An asbestos manufacturer may be entitled to use § 524(g)'s trust mechanism if it "is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." § 524(g)(2)(B)(ii)(I). AMH contends that Grace faces no future property damage demands.

"Claim," as described elsewhere in the Bankruptcy Code, means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). Section 524(g)(5) defines "demand" as a "demand for payment, present or future, that—

>(A) *was not a claim* during the proceedings leading to the confirmation of a plan of reorganization;
>(B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and
>(C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i)."

18

§ 524(g)(5) (emphasis added).

In AMH's reading of the statute, claims and demands are mutually exclusive because a demand "was not a claim during the proceedings leading to the confirmation of a plan of reorganization" and could be either dealt with in the ordinary course of the bankruptcy or not discharged at all. AMH contends that, although future demands are easily cognizable in the personal injury context, PD claims cannot result in future demands, because any buildings that contain asbestos already contain the material.

AMH concedes that future PD demands existed under the definition of "claim" set out in *Matter of M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984). There, we held that a claim arises when the underlying state-law cause of action accrues. Future PD claims could have existed if any potential claim from already-installed asbestos products had not, under various state laws, met the accrual requirements at the time potential claimants were notified of the bankruptcy. Under the "mutual exclusivity" theory AMH proposes, these unaccrued actions were not "claims" and therefore could meet the "demand" definition of "not a claim before the bankruptcy court." Nonetheless, AMH argues that *Frenville* (which was the law of this Circuit at the time of the bar date notice and the confirmation hearing) should not control for several reasons.

First, AMH argues that *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (en banc), supersedes *Frenville* on this issue by holding that "a 'claim' arises when an individual is exposed pre-petition to a product or other

19

conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." *Grossman's* explicitly overrules *Frenville*.[4] *Id.* at 121.

Second, AMH sees no basis in the evidence for the required finding that Grace is likely to be subject to substantial future demands, particularly when, in AMH's view, the testimony of Dr. Martin, Grace's sole witness for the idea that Grace was likely to be subject to substantial future PD demands, is best understood as using the term "demand" in the colloquial sense, as she explicitly stated she was not offering an opinion about the technical difference between a claim and a demand within the meaning of § 524(g).[5]

---

[4] AMH asked the District Court to reconsider its affirmance of the confirmation order in light of *Wright v. Owens Corning*, 679 F.3d 101, 108 (3d Cir. 2012). The District Court declined, finding this new development in the law insufficient to create the extraordinary circumstances required for relief under Federal Rule of Civil Procedure 60(b). It also declined to intervene because AMH could seek the same relief as part of this appeal. *In re W.R. Grace & Co.*, 476 B.R. 114, 122 (D. Del. 2012).

[5] AMH also argues that the Plan, as a matter of due process, cannot discharge the claims of property owners who would have held claims under the *Frenville* standard, but not under *Grossman's*. Because *Frenville* then controlled, AMH argues that Grace did not attempt to notify potential PD claimants who at the time of the bar date notice might have

20

Each of these objections fails. First, we find no clear error that would justify disturbing the factual conclusion that there are property damage claimants who will seek redress in the future. Dr. Martin testified, "The claims will be made. Yes, it's my opinion that there will be substantial – substantial claims will be made." JA at 201784-85. Expert

---

had impacted property but whose claims had not yet accrued under state law. AMH contends that, if these claims are to be discharged, the claim holders are entitled to participation in the process, including voting on the Plan. We do not see how this line of argument advances AMH's contention that Grace is not likely to face future property damage demands. Indeed, it seems to be wholly unrelated to that argument, as the due process implications of discharging a claim are entirely separate from the question of whether future demands—which, by AMH's reading, are by definition *not* claims—are likely to be brought. In any event, AMH does not contend that its due process rights have been violated by the Plan, nor could it, as it participated extensively throughout the bankruptcy proceeding and had the opportunity to vote. Therefore, as "litigants in federal court are [generally] barred from asserting the constitutional rights of others," *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) (internal quotation marks omitted), AMH lacks standing to raise that argument in this appeal. *See id.* (explaining that "limits on third-party standing are particularly relevant to appellate standing in bankruptcy proceedings" because "[b]ankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party")."

21

testimony sufficiently supported the claim that Grace will be subject to future demands and that AMH failed to provide evidence to the contrary, though it had the opportunity to do so. The Bankruptcy Court credited this expert testimony, noting the distinction between the *existence* of the demands and whether they will ultimately be allowed. *In re W.R. Grace & Co.,* 446 B.R. 96, 144 (Bankr. D. Del. 2011).

Second, we conclude that property damage future claims can exist as a matter of law. We reject AMH's assertion that *Grossman's* eliminated the category of future holders of demands, as *Grossman's* concerned the definition of claims and expressly stated that the plan at issue was not a § 524(g) plan. Congressional intent to allow a debtor to "emerge free and clear of the entire universe of asbestos liabilities," as evidenced by the statute's reference to present and future demands, underscores this point. Grace Br. at 24 (citing 140 Cong. Rec. at 14461, S514462 (October 6, 1994) (Sen. Heflin)).[6]

The Bankruptcy Court handled a similar statutory construction argument in *In re Flintkote Co.*, 486 B.R. 99, 124 (Bankr. D. Del. 2012). The *Flintkote* court concluded

---

[6] We place no importance on AMH's claims that Grace's counsel expressed a belief that there are no future PD claims. See AMHA at 700559-662. In the discussion AMH quotes, counsel appears to be referring to the merits of future demands rather than their existence. Even if we were to interpret the transcript as an admission, Grace's subjective belief should not change our statutory interpretation here.

22

that the reference to demands in § 524(g) was ambiguous and that a literal application of the term would produce results at odds with the legislature's intent. Responding to the suggestion that claim and demand are mutually exclusive, the court stated that

> "'demand' in § 524(g)(5) describes a 'present or future' demand for payment, and given the expansive definition of 'claim' in § 101(5), the Court cannot fathom a situation where an individual could hold a 'present' demand for payment that is not technically a 'claim' under § 101(5). Thus [if demand and claim are treated as mutually exclusive], the qualifier, 'present or future [demand],' in § 524(g)(5) is superfluous, and '[i]t is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous.'"

*Flintkote*, 486 B.R. at 124 (citation omitted). Additionally, *Flintkote* concluded that the position the creditor advanced there (which parallels AMH's) would produce a result that contravened congressional intent. In the Bankruptcy Court's description, because asbestos-related illnesses have a long latency period, Congress created the § 524(g) trust mechanism in order to protect the due process rights of people who had been exposed but not yet affected, and who might not manifest injury until a time when all available compensation had been paid out to people who got sick faster.

23

Section 524, therefore, improves equality of treatment among claimants. *Id.* at 124-25.

The Bankruptcy Court explained that, "because asbestos production in this country largely ceased many decades ago," *id.* at 125, it may be difficult, if not impossible, for a debtor to demonstrate it will "likely be subject to substantial future demands" under the creditor's proposed interpretation of "claim" and "demand." That interpretation would therefore prevent many debtors from qualifying for the protection of § 524(g), which would "defeat[] the purpose of the statute by removing the protections for 'exposed yet unimpaired' asbestos creditors and depriving them of just compensation for their future injuries and illnesses." *Id.* at 123. Thus, the Bankruptcy Court affirmed in *Flintkote* its earlier conclusion in this case that "future demand holders are those who have been exposed to asbestos but whose disease or other injury, sufficient to prove damages, has not yet manifested." *In re W.R. Grace*, 446 B.R. 96, 130 n.58 (Bankr. D. Del. 2011).

AMH's argument that there is no such thing as a future PD demand has some intuitive appeal. After all, asbestos installation has long-since ceased, so every building that will be damaged by asbestos already contains it. As a policy matter, the rationale for the § 524(g) trust mechanism is less clear here than in the personal injury context; if all property damage has occurred and those harmed can be notified, the ordinary claims process could arguably meet Congress's objectives of promoting equal treatment of claimants and allowing manufacturers to handle asbestos liability in an

24

orderly and streamlined process.[7]  This supports AMH's statutory interpretation, which emphasizes the "not a claim" language, giving "claim" in § 524(g) the same meaning it was assigned in *Frenville* and then *Grossman's* interpretations of the word claim in § 101(5).  As AMH describes property damage, if we applied the *Grossman's* test, the pre-petition exposure clearly makes the property damage cases "claims" that AMH's reading of § 524(g) excludes from the "demands" covered by the trust.

Ultimately, however, AMH's arguments must fail. Section 524(g) explicitly states that the asbestos trusts can cover property damage, so an interpretation that makes such trusts impossible cannot be consistent with congressional intent.  Furthermore, as the Bankruptcy Court demonstrated, AMH's "mutual exclusivity" theory would effectively read the category of present demands out of the statute.  For these reasons, we affirm the District Court's conclusion that

---

[7] AMH states in its brief that only one other asbestos trust for property damage has been created and that it was established by the same bankruptcy judge handling this case. *See In re United States Mineral Prods. Co.*, 2005 WL 5887219 (Bankr. D. Del. 2005).  In fact, other courts have created property damage trusts.  For example, a property damage trust was used in the *Manville* case that led Congress to draft § 524(g).  *See Matter of Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986).  Additionally, an Eagle-Picher Property Damage Trust compensated owners of buildings containing asbestos.  *See In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 279-82 (Bankr. S.D. Ohio 1996).

because "[i]t still remains unknown (and may never be ascertained) how many entities and individuals were affected by these products, the precise quantity of asbestos-laden products that were sold, which buildings the products were used in and how much was used per building, or the percentage of these entities that have successfully removed the asbestos products from their buildings," "there remains a significant chance that future property damage claims will be asserted against Grace by property damage claimants." *In re W.R. Grace Co.*, 475 B.R. 34, 101 (D. Del. 2012).

2.

Next, AMH argues that a trust under § 524(g) is unnecessary to equitably handle claims and future demands. *See* § 524(g)(2)(B)(ii)(III) ("pursuit of such demands outside the procedures prescribed by such plan [must be] likely to threaten the plan's purpose to deal equitably with claims and future demands"). According to AMH, § 524(g)'s procedures were not required because the "trust" is "simply a conduit for the payment of funds by reorganized Grace, inserted primarily if not exclusively to obtain the benefits of the § 524(g) injunction." AMH Br. at 38. Under the Plan, the PD Trust will be funded on the Plan's effective date with sufficient funds to pay the settled PD claims; if additional PD claims are later allowed, Grace will further fund the Trust. AMH contends that employing trust mechanisms under these circumstances is merely a pretext for directing litigation back to the Bankruptcy Court, effectively allowing Grace to forum-shop and avoid defending its case in front of a jury.

26

Furthermore, AMH finds a "fundamental illogic" in "extending § 524(g) to claims that are supposedly 'unimpaired' under the Plan" because there is no purpose to a trust, in AMH's view, if claims are to be paid at 100 percent of their value. AMH Br. at 39 (citing Barliant, Karcazes & Sherry, *From Free-Fall to Free-For-All: The Rise of Pre-Packaged Asbestos Bankruptcies*, 12 Am. Bankr. Inst. L. Rev. 441, 453 (Winter 2004)). AMH contends that Grace provided no evidence that the pursuit of PD claims outside the Plan procedures would threaten the Plan when Grace has stated its intention to pay 100 percent of PD claims as they are resolved.

AMH's argument underestimates the importance of creating a mechanism to resolve all of Grace's present and future asbestos liabilities. Outstanding, unresolved asbestos liability can make it extremely difficult for certain entities to amass operating capital, which can hinder a debtor's chances of long-term survival and, in turn, prevent equitable resolution of future asbestos claims. For that reason, both the PI trust and the PD trust are necessary to protect the interests of future asbestos claimants, as together they provide a level of certainty calculated to position Grace to compensate future claimants. *See Combustion Eng'g*, 391 F.3d at 234 (explaining that § 524(g) seeks to provide "an 'evergreen' source of funding to pay future claims" by allowing a debtor to emerge from Chapter 11 "cleansed of asbestos liability").

3.

Finally, AMH argues that the trust procedures are not fair and equitable because similar present claims and future demands will not be paid "in substantially the same manner."

27

§ 524(g)(2)(B)(ii)(V), (g)(4)(B)(ii). Because this argument duplicates AMH's broader claims of unequal treatment under both § 524(g) and § 1123(a)(4), these arguments are considered together in the following Part, which concludes that the equality requirement has been satisfied. We conclude, therefore, that the plan meets the requirements of § 524(g).

## B.

"Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). Two Code provisions relevant in this case mandate some form of equality. Section 1123(a)(4) requires a plan to "provide the same treatment" for each claim or interest in a class "unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Section 524(g)(2)(B)(ii)(V) requires the adoption of procedures that "provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." AMH argues that the Plan should not have been confirmed because it treats AMH substantially differently than other similarly situated creditors by denying AMH the opportunity to litigate in its chosen state forum, outside the jurisdiction of the Bankruptcy Court. Considering the Plan as an "integrated whole," the District Court found that the Bankruptcy Court had properly concluded that the Plan met these equality requirements. *In re W.R. Grace & Co.*, 475 B.R. 34, 124 (D. Del. 2012).

28

The District Court adopted the test that equal treatment under § 1123(a)(4) requires that "all creditors in a given class must receive equal value for their claims and must pay the same degree of consideration for their distribution under the trust." *W.R. Grace & Co.*, 475 B.R. at 140 (citing *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (citing *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986))). The reasoning of the Court of Appeals for the D.C. Circuit persuades us that "[i]t is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery."[8] *AOV*, 792 F.2d at 1152.

In *Combustion Engineering*, 391 F.3d at 239, we remanded for further record development where a two-trust structure could have potentially favored claimants to one trust over claimants to the other. The record then before us raised concerns about certain pre-petition settlements that led to the creation of a $400 million trust for the payment of claims. *Id.* at 240-42. Creditors who drew on the trust retained a "stub

---

[8] That is not to say that members of a class must receive the same amount of money for their claims. *See In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("Without question, the 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money."). Rather, the claimants in a class must simply have the same opportunity for recovery. *Id.*

claim" that allowed them to vote on the bankruptcy plan, which included a § 524(g) injunction. *Id.* at 201. We concluded that the creation of stub claims may have the result of artificially gerrymandering classes called upon to vote on a plan, adding claimants to the class who have already received more than they would have under the plan and thus have little incentive to scrutinize it before voting. *Id.* at 243-44.

AMH urges us to follow *In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002), for the proposition that § 1123(a)(4) requires equality in procedural treatment. There, the plan put governmental subrogation claims together into a class and would pay those claims in full in order to satisfy § 1129(b)(2)(B)'s "cram down" requirements. *Id.* at 659. Different procedural protections applied to different government units; the Canadian government entered into a settlement that allowed it to gain notice before payments were made to beneficiaries so that Canada could determine if a subrogation claim existed. *Id.* at 660. The Sixth Circuit held that this procedural guarantee, given only to Canada, meant that the United States did not receive equal treatment. *Id.*

Here, the District Court found that the Plan satisfied both prongs of the equal treatment test outlined in *Quigley* and *AOV*. *W.R. Grace & Co.*, 475 B.R. at 140. The District Court concluded that AMH's assertion that it was giving up more than other class members by losing its forum option was incorrect, because everyone who filed a proof of claim submitted to the Bankruptcy Court's jurisdiction—a necessity in order to maintain uniformity in treatment of claims in this highly technical area of law. *Id.* Even if litigating before the Bankruptcy Court were a true disadvantage, AMH voluntarily

30

submitted to it. *See Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (holding that Creditors submit themselves to the Bankruptcy Court's jurisdiction by submitting a proof of claim).

Here, AMH argues that the Joint Plan disadvantages it as compared to other Class 7A creditors because it is the only claimant that has been denied the right to pursue its case in its chosen forum. Under the Plan, all current PD claimants must resolve their property damage claims before the Bankruptcy Court. Future claimants may litigate their claims before a district court, potentially before juries.

AMH suggests that the District Court erred because there are no similarly situated creditors left,[9] because other asbestos claimants have either reached a settlement that will be paid on the Plan's effective date, were subject to alternative resolution procedures with lowered proof thresholds, or were permitted to litigate in their chosen forums. AMH says that it is the only claimant that "is required to litigate its claims in order to be entitled to payment, but is precluded from doing so in the forum it chose

---

[9] As evidence that the CMO and Plan were not designed to single out AMH, Grace notes that when the PD CMO was proposed in December 2008, all 37 asbestos PD claimants remaining at that time were subject to the procedures. When the CMO was revised in February 2009, it applied to 57 unresolved PD claims. Since that time, "virtually all" PD claimants besides AMH have settled. Grace Br. at 8.

31

nearly a decade before this bankruptcy case was commenced." AMH Br. at 46. Finally, AMH objects to the District Court's finding that it submitted to the Bankruptcy Court's jurisdiction because it had to file a proof of claim in order to protect its rights and "did so against the backdrop of repeated representations by Grace that pre-existing claims would be permitted to return to the tort system for resolution."[10] AMH Br. at 47.

No claims under Class 7A will be handled via alternative dispute resolution or lower proof thresholds; if AMH is comparing itself to the US ZAI claimants, the distinction is immaterial because those claimants are part of Class 7B. Regarding the other members of Class 7A, the future PD claimants represented by Judge Sanders, any difference between AMH and future claimants as to forum is meant to allay Seventh Amendment concerns and is not prejudicial.

Ultimately, the only relevant comparison here is between AMH and other members of Class 7A, the future PD

---

[10] AMH claims that Grace represented that AMH's and similar claims would be "permitted to return to the tort system." Grace responds that those filings merely state that "Grace will identify pending cases that could continue to be litigated in other courts . . . " and "[t]hat is in no way a 'representation' that, after being extensively litigated in the Bankruptcy Court, AMH's voluntarily filed class claim could returned to state court." *See* Grace Br. at 10 n.6 (citing PPA at 600935 ¶2, 600972, 601007).

claimants represented by Judge Sanders.[11] The only inequality AMH has identified is the ongoing jurisdiction of the Bankruptcy Court over AMH's claims, which prevents AMH from returning to the state court system in order to try its claims before a jury. AMH submitted to the jurisdiction of the Bankruptcy Court; future claimants will not have submitted, and thus will be free to file their cases in federal district courts. *See Langenkamp*, 498 U.S. at 44 ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of allowance and disallowance of claims, thereby

---

[11] AMH does not argue that it should not have been placed in a class with the future claimants, with whom AMH seems to believe it has conflicting interests. Moreover, AMH makes much of the fact that Judge Sanders described this as a "better deal" negotiated for the future claimants. In fact, this statement tells us very little; the exchange did not even elicit from Judge Sanders *why* he thought this was a better deal. The record shows that Judge Sanders was stating that he had negotiated the right for future PD claimants, who have not submitted themselves to the jurisdiction of the Bankruptcy Court, to seek redress in any district court with jurisdiction— a solution he thought "better" and "more fair" than requiring all of those future cases to be filed in the District Court of Delaware. In the next part of the questioning, having been asked to assume that AMH claims must remain in Bankruptcy Court, Judge Sanders responded to a somewhat incomprehensible non-question from AMH counsel with "My clients got a better deal than yours." AMHA at 700606-10.

33

subjecting himself to the bankruptcy court's equitable power.") (citations and internal quotation marks omitted).

Future PD claimants cannot be bound to the jurisdiction of the Bankruptcy Court in this way because they have not submitted proofs of claim granting the Bankruptcy Court jurisdiction and have not necessarily surrendered their rights to a jury trial. AMH insinuates that it is a matter of convenience (i.e., future claimants can choose a district court that is closer to the property and witnesses needed), but the most reasonable inference from their persistence on this issue is that it believes it is likely to recover more from a South Carolina state jury. AMH has not explained how being bound by the decision of the Bankruptcy Court leads directly to disadvantage in recovery, because to do so would lay bare assumptions about the fairness and adequacy of the Bankruptcy Court's proceedings that it cannot support. We conclude, therefore, that the Plan treats AMH sufficiently equally to other members of the same class to meet the requirements of §§ 524(g) and 1123(a)(4). Even if we were to conclude that binding AMH to the jurisdiction of the Bankruptcy Court represented "less favorable" treatment of its claim, AMH "agree[d] to a less favorable treatment of such particular claim or interest" by submitting itself to the Bankruptcy Court's jurisdiction via its proof of claim.

## C.

Under § 1129(a)(3), courts may only confirm reorganization plans proposed in good faith. "[T]he important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the

34

objectives and purposes of the Bankruptcy Code." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (quoting *In re Combustion Eng'g,* 391 F.3d at 247) (internal quotation marks omitted). Those objectives and purposes include "preserving going concerns and maximizing property available to satisfy creditors," "giving debtors a fresh start in life," "discourag[ing] debtor misconduct," "the expeditious liquidation and distribution of the bankruptcy estate to its creditors," and "achieving fundamental fairness and justice." *Am. Capital Equip., LLC*, 688 F.3d at 156-57 (internal citations and quotation marks omitted). Good faith presents mixed questions of law and fact; we review legal determinations de novo and factual determinations for clear error. *In re PWS Holding Corp.*, 228 F.3d 224, 242-43 (3d Cir. 2000).

In the view of the District Court, a good faith plan "(1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [exhibited] a fundamental fairness in dealing with the creditors." *W.R. Grace & Co.*, 475 B.R. at 88 (citing *Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)). The District Court concluded that the first factor had been satisfied because the Plan preserved Grace as a going concern in the face of overwhelming asbestos liability and, given the probability of forthcoming future claimants, gave Grace a better chance of being able to satisfy those claims. *W.R. Grace & Co.*, 475 B.R. at 87-88. Second, the District Court described the requirements of honesty, good intentions, and a reasonable expectation of

35

success as assurances that "the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy." *Id.* at 88 (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004)). The District Court concluded that nothing about the case suggested ulterior motives or dishonesty, particularly in light of the arms-length negotiations that led to the development of the Plan. *W.R. Grace & Co.*, 475 B.R. at 89. Third, the District Court again addressed AMH's equality arguments, recast as a claim of fundamental unfairness, and concluded that the Plan was not fundamentally unfair.

AMH asserts that the Plan fails to meet the good faith requirement for procedural and substantive reasons. First, AMH implies that Grace had the burden of proof in demonstrating "good faith negotiations with AMH with respect to the procedures imposed on the holders of unresolved PD claims." AMH Br. at 50. Second, AMH asserts substantive unfairness because the Plan provides preferential treatment to certain "favored" constituencies. According to AMH, Judge Sanders's testimony that he was able to secure a "better deal" for the future PD claimants shows that AMH is suffering from the kind of disparity that

raised questions meriting remand in *Combustion Engineering*.[12]

We reject AMH's arguments for several reasons. First, we find no support for the idea that the District Court clearly erred in its factual conclusion that the Plan resulted from "years of litigation and extensive arms-length negotiations." *W.R. Grace & Co.*, 475 B.R. at 89. The settlements of virtually all of the non-AMH PD claims and the overwhelming vote by creditors in favor of the plan bolster this conclusion. We reject AMH's implication that Grace's failure to negotiate directly with AMH undercuts the overall Plan's fundamental fairness, particularly when AMH declined to provide comments on drafts of the Plan when they were circulated during the negotiation process. *See*, *e.g.*, PPA

---

[12] Before us, AMH abandoned the argument it made to the District Court that the Plan fails the good faith requirement because Grace "repeatedly stymied" AMH's efforts to take discovery on the good faith issue. In any event, this argument lacks merit. In *In re Frascella Enter., Inc.*, 360 B.R. 435 (Bankr. E.D. Pa. 2007), the court found that a plan was not proposed in good faith when the proponents had repeatedly avoided making necessary disclosures until forced to by the court. The debtor's history of transactions suggested that some disclosures had been manipulated, and voting creditors did not receive information about the plan until the day before the vote. The District Court correctly concluded that no comparable behavior had occurred here. *In re W.R. Grace & Co.*, 475 B.R. 34, 89 (D. Del. 2012).

37

at 600774-90, 601400-02, 601403-05, 601475-571. Furthermore, as the District Court emphasized, the Bankruptcy Court participated extensively in the settlement process and had an opportunity to observe the parties' conduct. *W.R. Grace & Co.*, 475 B.R. at 90.

Second, we repeat our conclusion that AMH did not suffer from unfair inequality and note that a creditor's disagreement about the handling of its claim does not necessarily evince bad faith by the Plan's proponents. *See, e.g.*, *In re Barnes*, 309 B.R. 888, 893 (Bankr. N.D. Tex. 2004) ("[T]he fact that a plan proposed by a debtor is not the one that the creditors would have proposed does not make the plan one that has not been filed in good faith.") (citations omitted). On the contrary, Chapter 11 reorganizations rest on majority rule and routinely leave a minority of creditors dissatisfied. We note again that the Plan is designed to pay AMH's allowed claims in full.

Third, we reject AMH's contention that direct testimony from Grace's negotiators was required to demonstrate Grace's honesty and good intentions in proposing the Plan. Subjective intent, to the extent that it is one factor in determining that a Plan is not being used for purposes contrary to the Code's objectives, is routinely established by circumstantial evidence. A negative inference should not be drawn against Grace merely because it chose to protect the privacy of attorney-client communications. For a variety of privilege and evidentiary reasons, divining the subjective intent of a corporate actor through the testimony of the negotiators and other key people will often prove problematic and less than enlightening. In any event, it

38

would be an extraordinary circumstance where an objectively fair plan must be set aside because of mere suspicions concerning the subjective intent of the parties.

Furthermore, the Plan has little in common with reorganization schemes that have been rejected for want of good faith. In *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004), the bankruptcy court adopted the view that good faith means the plan was "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code. . . . with the most important feature being an inquiry into the fundamental fairness of the plan." There, the bankruptcy court found that the plan had not been proposed in good faith because it had been drafted primarily for the benefit of a pre-petition committee and memorialized a pre-petition settlement to the detriment of other claimants. *Id.*

Similarly, in *Combustion Engineering* we concluded that the use of stub claims potentially constituted "artificial impairment" under § 1129(a)(10) leading to serious doubt about whether the plan fulfilled the good faith requirement. 391 F.3d at 243. We remanded for further consideration of the issue in light of good faith. *Id.* at 261. Again, in *In re Am. Capital Equip., LLC*, applying the aforementioned good faith standard, we held that the plan lacked good faith because the proposed plan created an incentive for the debtor, a defunct business, to sabotage its own defense; severely limited insurers' procedural rights; and unlike a § 524(g) trust, created a fund in which the debtor made no contribution – instead withdrawing money from it. 688 F.3d at 159-61.

39

In this case, Grace has demonstrated that the Plan is fair, and AMH has provided no real argument that the Plan was not "proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected." *W.R. Grace & Co.*, 475 B.R. at 87-88. For these reasons, we affirm the District Court's conclusion that the Plan was proposed in good faith.

D.

Grace had the burden of demonstrating that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." § 1129(a)(11). Success need not be guaranteed, but must be reasonably likely. *Am. Capital Equip., LLC*, 688 F.3d at 156; *see also Quigley*, 437 B.R. at 142 (holding plan was not feasible where funding source was "speculative at best and visionary at worst"). We consider feasibility in the context of ongoing litigation and will find a plan not feasible if it "hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *Am. Capital Equip.*, 688 F.3d at 156 (finding plan not feasible where its only source of funding was proceeds from highly speculative litigation winnings). The District Court agreed with the Bankruptcy Court's factual conclusion—based on expert testimony, financial reports, estimates of Grace's future earning capacity, current economic conditions, and Grace's capital structure and earning power—that Grace had established a reasonable

40

likelihood of the Plan's success. *W.R. Grace & Co.*, 475 B.R. at 115.

AMH contends that Grace cannot meet its burden without establishing the amount of liability the Plan will need to satisfy in the future. According to AMH, Grace's feasibility expert relied only on Grace's creation of a $37.7 million reserve for PD liabilities and performed no independent analysis of the liabilities of the PD trust.[13] Without a clear picture of the trust's estimated liabilities, AMH argues, Zilly's testimony that a reorganized Grace would be able to fund as much as $1.6 billion over 25 years "proves nothing" because that figure has not been substantiated and because the Plan does not allow Grace to spread out its liabilities over 25 years, as Grace is required to fund that PD trust every six months in the amount of unresolved PD claims and future PD demands that were allowed during the preceding term. Finally, AMH argues that Grace's feasibility analysis did not account for the possibility that AMH class claims might be allowed. *See In re Harbin*, 486 F.3d 510, 517-19 (9th Cir. 2007) (finding clear error under § 1129(a)(11) when Bankruptcy Court failed to account

---

[13] AMH offers a one-sentence argument that we should reject Zilly's testimony because "expert testimony based on assumptions that are not supported by the record should have been excluded." AMH Br. at 52 (citing *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000)). In fact, *Elcock* does not support AMH's point because, in that case, the expert relied on information that was proven by the record to be false.

for possibility of large judgment against debtor in case on appeal at time of confirmation in its feasibility analysis).[14]

None of these arguments leads us to conclude that the District Court clearly erred in affirming the Bankruptcy Court's factual conclusion that the Plan would likely succeed. As the District Court noted, Grace needed only to demonstrate a reasonable likelihood of success, not an absolute certainty. Grace's evidence, including Zilly's testimony, remains uncontradicted. AMH has produced no evidence supportive of its objection.[15] AMH has offered no

---

[14] Additionally, AMH contends that Plan proponents did not "re-evaluate the adequacy of notice after the change in law announced by *Grossman's*, and now confirmed to be retroactive in effect by *Owens Corning*." AMH Br. at 56. Because under AMH's reading of *Grossman's*, property owners who have a Grace asbestos product in their property but whose state law claims have not yet accrued are claim holders whose cases cannot be channeled to the PD trust, AMH believes that the Plan will be threatened by the need to make non-trust payments it has not provided for. *Id.* As discussed above, we have rejected this reasoning.

[15] AMH points to the testimony of a KPMG accountant hired by Grace in 1995 who estimated the size of Grace's asbestos PD liability. Because the report was outdated and contemporaneously rejected by Grace, the Bankruptcy and District Courts concluded that the report did not accurately reflect the current information about outstanding PD liability. AMH has offered no compelling reason why we should find this factual conclusion to be clearly erroneous.

estimate of the size of its class claim, which could possibly be allowed to proceed if we were to reverse the District Court in a separate appeal—and that event appears sufficiently unlikely to block the conclusion that the Plan is reasonably likely to succeed.

We acknowledge that Grace has offered us little insight into the methodology used to arrive at the conclusion that $37.3 million provides an adequate reserve for the PD liability payments. But the scale of related claims[16] satisfies us that $1.6 billion in possible funding (an amount AMH has not refuted) has a reasonable likelihood of providing for all claims. We therefore affirm the conclusion that the Plan is feasible.

## IV.

For the reasons discussed above, AMH has failed to demonstrate that the Plan should not have been confirmed. We will affirm the District Court's holding.

---

[16] As of June 2012, Grace had settled 407 claims for a total of $147 million, leading to an average payout of approximately $361,179 per claim. *W.R. Grace & Co.*, 475 B.R. at 67. Those claims included "(1) California State University and University of California for $1.4 million; (2) Pacific Freeholds Ltd., Inc. for $9,043,375; (3) various hospitals and healthcare facilities for $576,250; (4) several private commercial building owners in the United States for $16 million; and (5) building owners in Canada for $2.5 million." *Id.* at 67 n.12.