**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2973
_____

IN RE: AKORN INC.

AFSCME DISTRICT COUNCIL 47 HEALTH & WELFARE FUND; SERGEANTS
BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND,
Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. No. 1-20-cv-01254)
District Judge: Honorable Maryellen Noreika
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 20, 2022

_____

Before: AMBRO, RESTREPO, and FUENTES, *Circuit Judges*.

(Filed: November 25, 2022)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

**RESTREPO**, *Circuit Judge*.

This appeal concerns a challenge to the approval of a Chapter 11 bankruptcy plan (the "Plan"). Appellants are unsecured creditors of Appellee, Akorn, Inc. They raise several defects in the Plan that they claim left insufficient value to afford their creditor class a recovery under its waterfall. The Bankruptcy Court approved the Plan and the District Court affirmed. We will likewise affirm.

**I.**

We presume the parties' familiarity with the case and set out only the facts needed for the discussion below.

**The Parties.** Appellee Akorn is a pharmaceutical company in the business of generic and branded health products. Appellants are among plaintiffs to a multidistrict litigation against Akorn and other generic drug manufacturers for alleged anti-competitive conduct. *In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-MD-2724-CMR (E.D. Pa. Aug. 5, 2016).

**The Merger and Related Pre-Petition Settlement.** After a failed merger with Fresenius Kabi AG in April 2018, Akorn settled related securities litigation with a class of shareholders in August 2019. *In re Akorn, Inc. Data Integrity Secs. Litig.*, No. 1:18-CV-1713 (N.D. Ill. Mar. 8, 2018) (the "Class Action Settlement"). Settling plaintiffs, excluding those who opted out (the "Opt-Out Shareholders"), received a distribution of

2

$27.5 million directly from a D&O insurance carrier and approximately 6.7 million shares of Akorn common stock.

**The Sale.** The failed merger and Akorn's associated financial issues subsequently affected a loan agreement with Akorn's secured lenders (the "Secured Lenders"), and a Standstill Agreement was later reached between the two, allowing Akorn some "breathing room" to either refinance or pay down its debts. JA385.

The Secured Lenders eventually agreed to serve as a stalking-horse bidder in Chapter 11, preserving Akorn's business as a going concern through a "credit bid" on Akorn's outstanding debt. JA130. The Secured Lenders subsequently agreed to purchase the bulk of Akorn's assets in exchange for a release of Akorn's debt under the loan agreement. The Secured Lenders also agreed to assume $5 million of Akorn's additional undisputed non-litigation unsecured debt.

Not included in the sale were a remaining D&O insurance policy, hypothetical avoidance actions to recover the Class Action Settlement, liabilities arising from litigation against Akorn by Provepharm, and a 50% interest in a defunct nasal spray product (together, the "Retained Assets"). The Bankruptcy Court approved the sale over Appellants' objections, noting that "the market has spoken with respect to the value of the debtor's assets," as "[t]he current offer is the best and only actionable transaction supported by most parties in interest." JA589.

**The Chapter 11 Plan.** Akorn's reorganization plan included eight classes, with the Secured Lenders in "Class 3," and unsecured claimants, like Appellants, in "Class 4." Class 3 was designated an "impaired" class, and as such, its approval of the Plan allowed

3

it to proceed, despite objections, as a Bankruptcy Code § 1129(b) "cramdown." After a three-day trial, the Bankruptcy Court overruled Appellants' objections and confirmed the Plan.

**Disposal of the Retained Assets.** Each of the remaining Retained Assets was then strategically disposed of as part of the wind-down process. Post-petition, Akorn settled with the Opt-Out Shareholders using funds from its remaining D&O insurance policy, but declined to avoid the Class Action Settlement, citing the cost and uncertainty of unwinding it. Akorn settled litigation with Provepharm, releasing its counterclaims to garner Provepharm's support for the Plan. Similarly, Akorn settled litigation with Rising, its co-owner in the nasal spray product, in exchange for the rest of its share in the product and Rising's support for the Plan.

## II.

Appellants raised fifteen errors related to the Plan below; the District Court rejected all of them. On appeal, Plaintiffs assert that (1) the Retained Assets had value, and as such, the manner of their distribution under the Plan did not maximize the value of the estate and violated the absolute priority rule; (2) Akorn should have proceeded through Chapter 7 instead of Chapter 11; (3) the Plan misclassified creditors and treated certain classes unfairly; and (4) the Plan was put forth in bad faith.

## III.

The District Court had jurisdiction pursuant to 28 U.S.C. § 158(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291.

4

"Because the District Court sat as an appellate court to review the Bankruptcy Court, we review the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 816 (3d Cir. 2010).[1]

## IV.

We review each of Appellants' challenges to the Plan in turn.

### A. Improper Designation of Retained Assets as Having No Value

Frustrated that they did not recover on their unsecured litigation claims against Akorn under the Plan, Appellants argue that Akorn's distribution of the Retained Assets violated the absolute priority rule and constituted a failure to maximize the value of the estate available to creditors like themselves.

The absolute priority rule bars transfers of property under a plan to creditors junior to a claimant class (here an unsecured class), absent the senior class's consent. 11 U.S.C. § 1129(b)(2)(B)(ii). Appellants argue that the Retained Assets were valuable estate property that should have been used to satisfy their claims and not distributed to junior creditors. The Bankruptcy Court implicitly and the District Court explicitly rejected this

---

[1] More specifically, the Bankruptcy Court's findings as to the value of estate property are reviewable for clear error. *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 214 (3d Cir. 2006). A bankruptcy court's factual finding "that creditors rejecting the plan would not receive a greater recovery in a Chapter 7 liquidation," is reviewed for clear error. *In re PWS Holding Corp.*, 228 F.3d, 224, 250 (3d Cir. 2000). Further, this Court "will uphold a plan's classification scheme so long as it is reasonable and does not arbitrarily designate classes." *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (internal quotations omitted). Finally, we review the Bankruptcy Court's good-faith determination for abuse of discretion. *See In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999).

premise, finding that different treatment of the Retained Assets would have yielded no greater recovery for Appellants or the estate as a whole.

Appellants emphasize that "any otherwise cognizable property interest must be treated as sufficiently valuable to be recognized under the Bankruptcy Code." *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 455 (1999). However, our Court has recognized that "value" is not a zero-sum proposition in this context. In *In re PWS Holding Corp.*, we held that an asset "of only marginal viability [that] could be costly for the reorganized entity to pursue" may be found to have no value to that entity for purposes of the absolute priority rule, even if exchanged for value to a third party during reorganization. 228 F.3d 224, 242 (3d Cir. 2000). The same logic applies to the duty to maximize the value of the estate. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 163 (3d Cir. 2012) (noting no need to pursue asset if cost of pursuit would exceed its value, as duty to maximize value of the estate looks to net assets).

Appellants argue that the Retained Assets must have been valuable because they were exchanged for value in the form of support for the Plan, release of litigation claims, etc. But under our precedents, this is not an improper distribution to junior credit holders if the value of the assets is contingent or conjectural – like the uncertain and costly-to-pursue litigation and avoidance claims, nasal spray product requiring a $3 million cash infusion to be potentially viable, and narrowly construed insurance policy at issue here.

Appellants' counter-assertions as to the value of the Retained Assets to Akorn are both highly speculative and unsupported by evidence. Especially considering the more certain and cost-efficient ways in which Akorn strategically handled those assets while

6

piecing together the precarious puzzle of its restructuring plan, Appellants fail to convince us that there existed a more fruitful alternate course. The Bankruptcy Court and District Court's determinations that each of the Retained Assets was valueless to the estate were not clearly erroneous, and their findings that the Plan maximized the value of the estate and did not violate the absolute priority rule were proper.[2]

## B. Retained Assets Should Have Been Liquidated

Appellants also charge that under Bankruptcy Code § 1129(a)(7), the Retained Assets should have instead been liquidated and distributed under a Chapter 7 liquidation, as this would have provided them a greater recovery. Appellants' claim assumes that the Retained Assets indeed had value, however, as discussed above, they have failed to persuade that theirs or any creditor class would have captured more or any value from those assets through liquidation. The Bankruptcy Court credited the analysis of Akorn's financial advisor, who concluded that liquidation would have also yielded "zero percent recovery" to Appellants' class. JA802. Appellants have provided no counter-analysis or other compelling reason to doubt that conclusion.

## C. Misclassification of Claims and Unfair Treatment of Creditors

---

[2] Appellee argues that certain of Appellants' claims about the Retained Assets were waived when Appellants only challenged the Plan as a whole, but Appellee itself did not raise this argument before the District Court, and so their waiver argument is thereby waived on appeal. *See United States v. Quiroz*, 22 F.3d 489, 491 (2d Cir. 1994) (collecting cases).

Appellants assert that the Plan treated members of Class 4—the unsecured creditors—unequally in violation of Bankruptcy Code § 1123(a)(4) because the Secured Lenders purchased only certain unsecured claims. However, those claims were purchased before the approval of the Plan and were never even in Class 4. To skirt this logical flaw, Appellants claim that a statement by the Committee of Unsecured Creditors that the Secured Lenders would assume "essentially all undisputed non-litigation unsecured debt" was insufficiently clear to ascertain which claims were to be covered by the Plan, and, as a result, these claims defaulted into Class 4 until properly identified. This argument strains reason, particularly as the Bankruptcy Code does not require that the covered claims be identified on a liability-by-liability basis. 11 U.S.C. § 1123(a)(1). The Bankruptcy Court's approval of the Plan's classification scheme—which never included the unsecured claims at all—was reasonable and not arbitrary.

Appellants also claim that the Secured Lenders' class was not "impaired" for purposes of approving the Plan despite objections as a § 1129(b) "cramdown," since it "received everything it was due under the Standstill Agreement." Appellee Br. at 37–38. However, "impairment" for these purposes is presumed unless a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1); *In re PPI Enterprises (U.S.) Inc.*, 324 F.3d 197, 202–03 (3d Cir. 2003). The Plan clearly altered the Secured Lenders' rights, as one of its primary functions was to curtail the Lenders' contractual remedies

8

under the loan agreement in the event of a default on their loan to Appellee Akorn.[3]  The

Bankruptcy Court's impairment determination was not in error.

### D. The Plan Was Not Proposed in Good Faith

Lastly, Appellants charge that the Plan was not proposed in good faith, as

required by 11 U.S.C. §1129(a)(3), because it intentionally "singled out unsecured

litigation claimants and froze them out of the distribution of estate value."  Appellant

Br. at 43.  Again, Appellants support their claim by pointing to the Plan's treatment of

the Retained Assets—which we have held above was not improper—and insisting

without support that the entire bankruptcy was put forth solely to prevent their

recovery.  On appeal, as below, Appellants "ha[ve] not presented anything but

innuendo in support of [their] argument that [Akorn] failed to act in good faith."

*PWS*, 228 F.3d at 243.  The Bankruptcy Court and District Court's good faith

determinations were not an abuse of discretion.

### V.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[3] Contrary to Appellants' assertions, these remedies do not stem from the Standstill Agreement; it states that it is "temporary and limited in nature," and cannot prevent the Secured Lenders "from exercising any rights" under the loan agreement.  JA332.  As the District Court pointed out, "Appellants have not identified anything in the standstill agreement that negates the lenders' rights under the loan agreement."  JA144.